NORTH ARKANSAS MEDICAL CENTER, f/k/a Boone County Hospital, Appellant,

v.

Arther W. BARRETT, Sr., Estate of Elsie M. Barrett, Arther Barrett, Jr., Cathy Barrett, Royce Barrett, Edith Barrett, Donald C. Crutchfield, Bobby L. Pinson, Guaranty Savings & Loan Association, FDIC as manager of the FSLIC Resolution Fund, as Receiver for Guaranty Savings & Loan Association, Office of Thrift Supervision, and Bowman & Company, Appellees.

NORTH ARKANSAS MEDICAL CENTER, f/k/a Boone County Hospital, Appellee,

v.

Arther W. BARRETT, Sr., Estate of Elsie M. Barrett, Arther Barrett, Jr., Cathy Barrett, Royce Barrett, Edith Barrett, Donald C. Crutchfield, Bobby L. Pinson, Guaranty Savings & Loan Association, Office of Thrift Supervision, and Bowman & Company. FDIC as manager of the FSLIC Resolution Fund, as Receiver for Guaranty Savings & Loan Association, Appellants.

Nos. 90–2340, 90–2583.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 11, 1991.

Decided April 17, 1992.

Robert D. McGillicuddy, Washington, D.C., argued (Dorothy L. Nichols, Ann S. Duross, Joan E. Smiley, Robert D. McGillicuddy, Washington, D.C., and Garland Garrett and Jess Askew, III, Little Rock, Ark., on brief), for appellee F.D.I.C.

Mark W. Nichols, Little Rock, Ark., argued, for appellee Bowman & Co., Inc.

Before JOHN R. GIBSON, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

North Arkansas Medical Center appeals from the judgment of the district court[1] dismissing its complaint against the FDIC as receiver for the failed thrift, Guaranty Savings & Loan Association, holding that an agreement to pledge securities as collateral for jumbo certificates of deposit and other accounts did not satisfy the requirements of 12 U.S.C.A. § 1823(e) (West 1989). *North Ark. Medical Ctr. v. Arther W. Barrett, Sr.,* No. Civ. 89–3067, 1990 WL 364778 (W.D.Ark. May 4, 1990). On appeal, the Medical Center argues that the district court erred (1) in permitting the

---

**1.** The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

FDIC to act as successor receiver for a pre–1989 savings and loan receivership; (2) in applying the Financial Institutions Reform and Recovery Act (FIRREA), Pub.L. No. 101–73, retrospectively to render section 1823(e) applicable to this case; (3) in holding that a security agreement must satisfy the requirements of section 1823(e) to be enforceable against the receiver; and (4) in applying FIRREA sections 212(a), (i)(1) and (2) to negate all security interests in a failed thrift's assets. The Medical Center also appeals from the district court's order entering partial summary judgment in favor of Bowman & Co., which the Medical Center claimed breached a duty to perfect the Medical Center's security interest, and from its order dismissing the remaining individual defendants for lack of a federal question. The FDIC cross appeals from the district court's holding that the common law *D'Oench, Duhme*[2] doctrine would not bar the Medical Center's claims. We affirm the judgment of the district court.

As a foreword, we observe that our task in deciding this appeal was made more difficult because the appellant's brief did not include a statement of facts. *See* Fed. R.App.P. 28(a)(3) (effective until Dec. 31, 1991) (appellant's brief shall contain statement of facts). Therefore, this court was required to glean the facts from pleadings and cryptic exhibits, totalling 83 pages in all. This exercise certainly gave weight to the FDIC's argument that it should not be charged with knowledge of the legal significance of every scrap of paper in a bank's files; we were able to experience first-hand the difficulty the FDIC complains of.

From January 1983 to December 5, 1985, the date Guaranty was placed in receivership, the Medical Center made deposits with Guaranty that eventually added up to about a million dollars, most of which was placed in jumbo certificates of deposit. The deposits exceeded the amount of deposit insurance. The Medical Center and Guaranty arranged for Guaranty to put up collateral to secure the amount of the Medi-

cal Center's deposits that exceeded FSLIC insurance coverage. Originally, Guaranty entered a "Collateral Custodial Agreement" with Worthen Bank & Trust Company, naming the Medical Center as a third party beneficiary. Under the Worthen agreement, Guaranty pledged a certain security to the Medical Center as collateral for its deposits, with Worthen acting as custodian. In June or early July 1985 Guaranty sold the security without telling the Medical Center. Belatedly, Guaranty obtained the Medical Center's permission to release the collateral. Guaranty provided the Medical Center with a signed letter designating substitute collateral:

This is to inform you that U.S. Treasury Bills are being purchased today as substitute collateral. These Treasury Bills will serve as your collateral until August 22, 1985. A confirmation letter from the securities dealer who will hold these Treasury Bills in safekeeping for your account will be sent to you by July 16, 1985.

On August 22, 1985, your collateral will be Federal Home Loan Mortgage Corporation pass-through certificates. A new collateral pledge will be issued to you as soon as possible after August 22, 1985.

Guaranty then entered an agreement with Bowman & Co., Inc., for Bowman to hold the securities Guaranty had pledged to its depositors. The Medical Center alleges that Guaranty purchased and sold in turn various securities pledged to the Medical Center. The Medical Center deposited $250,000 in new money in CDs at Guaranty on November 26, 1985. A Guaranty "housing location report" dated December 2, 1985, listed various securities and included a notation identifying a particular Federal Home Loan Mortgage Corporation Certificate (No. 256792A) in the amount of $1,014,618.36 as "BCHP," its code for "Boone County Hospital Pledge." (The Medical Center was formerly known as Boone County Hospital.) Bowman had cus-

---

**2.** *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In *D'Oench, Duhme,* the Court applied federal common law to protect the FDIC from the effect of a secret

agreement between a failed bank's management and its debtor that a certain note would not be binding on the debtor.

tody of the FHLMC certificate, known as the "November certificate."

Guaranty was placed in FSLIC receivership on December 6, 1985. On that date the Medical Center had $968,146.62 in deposits at Guaranty. The Medical Center has to date received more than $630,000.00 of its deposit from the receiver in the form of $100,000.00 in deposit insurance, $192,500.00 in a settlement with FSLIC of the Medical Center's claim for additional deposit insurance, and $341,344.98 in distributions in respect of its position as an unsecured creditor.

The Medical Center brought this suit in state court against Guaranty and some of its officers and directors, the FSLIC, the FDIC, the Office of Thrift Supervision, the FSLIC Resolution Fund, and Bowman & Co. The Medical Center sought a declaration that it had a perfected security interest in the November FHLMC Certificate. Alternatively, it claimed that Guaranty and Bowman had breached contractual duties to keep the Medical Center's deposits fully secured. The Medical Center made various other claims against Guaranty, Bowman and the other defendants, all arising out of the same facts.

Upon the enactment of FIRREA, the FSLIC was abolished. The FDIC was substituted for the FSLIC in this case as successor receiver for Guaranty, and it removed the case to federal court.

On a motion to dismiss by the federal defendants and cross motions for summary judgment by the Medical Center and Bowman, the district court ruled that the FDIC was entitled to judgment because the Medical Center's claim against it was barred by 12 U.S.C.A. § 1823(e),[3] which was made applicable to this case by FIRREA, enacted August 9, 1989. Order of May 4, 1990, slip op. at 17. The district court held:

[I]nsofar as plaintiff's claims against the federal defendants are concerned, plaintiff cannot affirmatively assert the alleged security agreement and perfection of plaintiff's security interest, unless all of the requirements of § 1823(e) are satisfied. They are obviously not.

The documents upon which plaintiff relies were not executed by both plaintiff and Guaranty contemporaneously with Guaranty's acquisition of the asset to which the documents pertain and there is little indication that the writings evidencing a security agreement were independently approved by the board of directors or the loan committee.

Therefore, plaintiff's alleged security interest in the FHLMC certificates, perfected or not, may not be asserted against the federal defendants.

Slip op. at 17.

However, since the Medical Center also asserted a claim against Bowman & Co. for failure to perfect the Medical Center's security interest, the district court went on to consider whether the Medical Center had a perfected security interest in the November FHLMC certificate at the time Guaranty went into receivership. Slip op. at 18. The district court determined that at the

---

**3.** Section 1823(e) as amended by FIRREA provides:

**(e) Agreements against interests of Corporation**

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

**(1)** is in writing,

**(2)** was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

**(3)** was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

**(4)** has been, continuously, from the time of its execution, an official record of the depository institution.

FIRREA also added 12 U.S.C.A. § 1821(d)(9) (West 1989), which expressly makes section 1823(e) applicable to claims asserted against the FDIC: "[A]ny agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the corporation."

time Guaranty went into receivership, the Medical Center had a temporarily perfected security interest in the November FHLMC certificate under Ark.Code Ann. § 4–8–313(1)(i) (Michie 1987) (UCC § 8–313(1)(i)).[4] The district court found that the July 15, 1985, letter from Guaranty to the Medical Center was a security agreement; that the Medical Center's purchase of $250,000 in CD's on November 26, 1985, was new value; and that the security agreement adequately described the FHLMC certificate under state law. Slip op. at 24–28. The court held that these facts gave the Medical Center a temporarily perfected security interest for twenty-one days under Ark. Code Ann. § 4–8–321(2) (Michie 1987), and found that the twenty-one days had not expired when the FSLIC took over Guaranty. Slip op. at 24–28. Based on this finding of temporary perfection, the court entered partial summary judgment for Bowman on the Medical Center's claim that Bowman failed to perfect the security interest. *Id.* at 28.

The district court never addressed the question of whether the Medical Center had a security interest in the FHLMC certificate greater than the $250,000 amount, stating that since perfection was irrelevant to the Medical Center's rights under § 1823(e), there was no need to explore that issue. Slip op. at 28.

The district court also gave an alternative basis for its holding. It interpreted other provisions of FIRREA, §§ 212(a), (i)(1) and (2), codified at 12 U.S.C.A. 1821(i) (West 1989), to limit the Medical Center's claim to its pro rata share of Guaranty's assets, instead of the larger share the Medical Center claimed by virtue of its security interest. The court held that "regardless of plaintiff's perfection or unperfection of its security interest, and regardless of the applicability of the *D'Oench* doctrine or § 1823(e), plaintiff is merely entitled to recovery as a *pro rata* distributee of the liquidated assets of a failed

savings and loan institution." Slip op. at 30.

The district court dismissed the Medical Center's other claims against the federal defendants on the merits, slip op. at 33, and dismissed the remaining claims for lack of a federal question. Order of June 5, 1990.

■ The FDIC and the Medical Center dispute whether the district court's order regarding the FDIC was a dismissal or a summary judgment. Although the FDIC's motion asked for dismissal and the record consisted only of the unverified pleadings and exhibits thereto, the FDIC now characterizes the order as a summary judgment. In any case, a summary judgment motion filed solely on the basis of pleadings is the functional equivalent of a dismissal motion, *Blum v. Morgan Guar. Trust Co.*, 709 F.2d 1463, 1466 (11th Cir.1983), and therefore we review the district court's order as a dismissal of the Medical Center's claim against the FDIC.

In passing on the sufficiency of the complaint, " 'we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

## I.

■ The Medical Center first argues that the FDIC is not entitled to rely on section 1823(e) because it is not the receiver for Guaranty. The FSLIC was, of course, the original receiver for Guaranty. Upon the enactment of FIRREA, the FSLIC was abolished, FIRREA § 401(a)(1), 103 Stat. 354 (1989), and the district court granted the FDIC's motion to be substituted as receiver.

---

**4.** Ark.Code Ann. § 4–8–313(1)(i) provides:
(1) Transfer of a security or a limited interest (including a security interest) therein to a purchaser occurs only: ... (i) With respect to

the transfer of a security interest where the transferor has signed a· security agreement containing a description of the security, at the time new value is given by the secured party.

The Medical Center argues that FIRREA did not authorize the FDIC to step in as receiver. The Medical Center relies on FIRREA § 212(a)(c)(1), 103 Stat. 222, codified at 12 U.S.C.A. § 1821(c)(1) (West 1989), which states that the FDIC "may accept appointment and act as conservator or receiver for any insured depository institution *upon appointment* in the manner provided in paragraph (2) or (3)." (Emphasis added). The FDIC was never appointed receiver in this case, but has proceeded on the assumption that it automatically succeeded FSLIC as receiver. According to the Medical Center, the proper party to be substituted for the FSLIC would be the FSLIC Resolution Fund, to which Congress transferred the FSLIC's assets upon the enactment of FIRREA. FIRREA § 215(a)(2), 103 Stat. 253, codified at 12 U.S.C.A. § 1821a(a)(1) (West 1989).

The FDIC has not pointed to any provision of FIRREA explicitly authorizing the FDIC to step in as successor receiver in this case. Responsibility for receiverships is allocated by date, with no explicit provision made for FSLIC receiverships begun before 1989, as this one was. FIRREA § 501, 103 Stat. 370, codified at 12 U.S.C.A. § 1441a(b)(6) (West Supp.1991), authorizes the RTC to succeed the FSLIC in receiverships initiated between January 1, 1989, and August 9, 1989. FIRREA § 212(a), 103 Stat. 224–25, codified at 12 U.S.C.A. § 1821(c) (West 1989), divided the responsibility for federal depository institution receiverships appointed after the date of FIRREA's enactment between the FDIC and the RTC. *See also* FIRREA § 501; codified at 12 U.S.C. § 1441a(b)(3) (giving RTC duty of resolving all FSLIC receiverships appointed January 1, 1989, to August 9, 1992); FIRREA § 301, codified at 12 U.S.C.A. § 1464(d)(2)(H)(ii) (Director of OTS may appoint only RTC or FDIC as receiver for savings associations). The FSLIC Resolution Fund is not an agency capable of carrying on a receivership, but is simply a pool of money to be managed by the FDIC, 12 U.S.C.A. § 1821a(a)(1) (West 1989); thus, the Medical Center's argument that the FSLIC Resolution Fund must succeed FSLIC in this case is impossible.

Interestingly, the Senate Bill, S. 774, 101st Cong., 1st Sess. § 212(a)(c) (1989), would have explicitly provided for the FDIC to take over pre–1989 FSLIC receiverships. *See generally* S.Rep. No. 101–19, 101st Cong., 1st Sess. 313 (1989). The House Bill, H.R. 1278, was passed instead. 1989 U.S.C.C.A.N. 86.

Notwithstanding this gap, FIRREA makes it clear that FSLIC receiverships remained in effect despite the dissolution of the FSLIC. FIRREA § 401(h), 103 Stat. 357. FIRREA § 401(f)(2), 103 Stat. 356, provides that the abolition of FSLIC should not abate lawsuits filed by or against FSLIC and that the appropriate successor should be substituted. Thus, the FDIC necessarily succeeded as receiver in this case because no other agency was given that authority, yet Congress clearly intended pre–1989 FSLIC receiverships to continue. To conclude that FIRREA meant to leave pre–1989 receiverships dangling in mid-air in the midst of a national savings and loan crisis would be absurdly contrary to congressional intent in enacting FIRREA. We therefore recognize the FDIC as the proper successor in interest to the FSLIC.

## II.

The Medical Center also argues that 12 U.S.C.A. § 1821(e)(11) (West 1989), amended by FIRREA § 212(a)(e)(11), protects perfected security interests from the effects of section 1823(e). Section 1821(e)(11) provides:

> No provision of this subsection shall be construed as permitting the avoidance of any legally enforceable or perfected security interest in any of the assets of any depository institution except where such an interest is taken in contemplation of the institution's insolvency or with the intent to hinder, delay or defraud the institution or the creditors of such institution.

The quoted language does not protect security interests generally, but only states that they may not be avoided under "this subsection"—that is, 12 U.S.C.A. § 1821(e),

which gives the receiver the right to repudiate burdensome pre-receivership contracts. Section 1823(e) is obviously an entirely different section. Therefore, the language protecting security interests does not affect the applicability of section 1823(e) to security agreements.[5]

The Medical Center cites language from an early House Report on FIRREA, H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess. 332 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 128, that discussed protection of security interests in connection with the *D'Oench, Duhme* doctrine:

> In general, the FIRRE Act provides, as the FDI Act presently provides, that no agreement can form the basis of a claim against the Corporation or the conservator or receiver unless it is in writing and properly approved and maintained in the records of the institution.... Subsection (c) also protects the holders of legally perfected security interests and new subsection (1) provides for expedited relief for holders of such security interests.

At first glance this language seem to reveal congressional intent to preserve security interests and perhaps to preserve them from the effects of section 1823(e). A closer look at this report shows that the version of H.R. 1278 that accompanies H.R.Rep. No. 101–54(I) is materially different from the H.R. 1278 that Congress eventually enacted. In the early version, section 212(5)c(7)(A)(vi) contained language similar to that of FIRREA § 212(a)(e)(11), now codified at 12 U.S.C.A. § 1821(e)(11) (West 1989). However, instead of the specific reference to "this subsection" that appears in 12 U.S.C.A. § 1821(e)(11), the earlier version of the bill said: *"Nothing herein* is intended to allow the avoidance of any legally perfected security interest...." H.R.Rep. 101–54(I) at 46. While "nothing

herein" could arguably mean "nothing in all of FIRREA," the bill as enacted refers specifically to "no provision of this subsection" and thus is limited in effect so that it has nothing to do with the issue in this case. We are not persuaded by the Medical Center's citation of language from a report concerning an earlier draft of the bill.

## III.

The heart of this case is the Medical Center's attack on the applicability of section 1823(e) to its claim against the receiver.

If the Medical Center's security agreement is subject to § 1823(e) it would not be valid against the FDIC unless it satisfied four requirements: that it be in writing; that it be signed by Guaranty and the Medical Center contemporaneously with acquisition of the certificate; that it have been approved by Guaranty's board or loan committee; and that it have been an official record of Guaranty continuously from the time of its execution. *FDIC v. Manatt*, 922 F.2d 486, 488 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991). The Medical Center does not even claim that the security agreement meets these four requirements—for instance, the security agreement was never approved by Guaranty's board or loan committee. Thus, the Medical Center's claim rises or falls on the question of whether section 1823(e) applies.

Initially, we must consider whether we are to apply FIRREA retrospectively, since before the enactment of FIRREA section 1823(e) did not by its terms apply to the FDIC acting in its receivership capacity or, indeed, to the FSLIC acting in any capacity.[6] The Medical Center argues that

---

**5.** 12 U.S.C.A. § 1821(d)(9)(A) (West 1989), which makes section 1823(e) applicable to claims asserted against the FDIC, is also unaffected by section 1821(e), since it is located in a different subsection of section 1821.

**6.** Even before FIRREA was enacted, we stated in *Firstsouth, F.A. v. Aqua Construction, Inc.*, 858 F.2d 441, 443 (8th Cir.1988), that the federal common law *D'Oench, Duhme* doctrine would

"by analogy" adopt the provisions of section 1823(e) in a FSLIC receiver case. In this case, the district court stated that the common law *D'Oench, Duhme* doctrine would not bar enforcement of the security interest. *North Ark. Medical Ctr.,* slip op. at 12–13. In light of our holding that section 1823(e) bars assertion of the security interest, we need not decide whether the common law *D'Oench, Duhme* doctrine might lead to the same result. Thus, this case

the district court's retrospective application of FIRREA is erroneous. However, the retroactivity of FIRREA's amendment to section 1823(e) is a matter of *stare decisis* in this circuit, *see FDIC v. Kasal,* 913 F.2d 487, 493 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991); *Reding v. FDIC,* 942 F.2d 1254, 1259 (8th Cir.1991). This panel may not reconsider *Kasal*'s mandate that the FIRREA amendments apply to pre-FIRREA receiverships. Nor does our study of the cases persuade us that we should. *See generally FDIC v. Wright,* 942 F.2d 1089, 1095–97 (7th Cir.1991), *pet'n for cert. filed,* No. 91–1274 (Nov. 27, 1991).

■ The Medical Center's chief argument is that section 1823(e) properly applies only to claims and defenses of "borrower[s], debtor[s] or other obligor[s]" of the failed bank, *not* to "depositors and creditors." The FDIC claims there is no such distinction because the *D'Oench, Duhme* doctrine and section 1823(e) have been expanded to include affirmative claims.

Our starting place in addressing the Medical Center's debtor/creditor argument must be the plain language of section 1823(e) itself. The Medical Center's claim of a security interest[7] in the November FHLMC certificate arises from an agreement that, if enforced, would tend to diminish the FDIC's interest in the November FHLMC certificate, which it acquired as receiver of an insured institution. Nothing in the statute itself suggests that section 1823(e) would not apply to a creditor's claim. Indeed, FIRREA § 212(a)(d)(9)(A), 103 Stat. 231, codified at 12 U.S.C.A. § 1821(d)(9)(A), expressly makes section 1823(e) applicable to affirmative claims:

[A]ny agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the corporation.

The plain language of section 1823(e) and section 1821(d)(9)(A) disposes of the Medical Center's claim.

When a statute's plain language is unambiguous, we must apply it in accord with that patent meaning, unless the result would be " 'demonstrably at odds with the intentions of its drafters.' " *Demarest v. Manspeaker,* —— U.S. ——, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991) (citation omitted). We must ask whether the result of applying section 1823(e) literally would be "so bizarre that Congress 'could not have intended' it." *Id.* (citation omitted).

The Medical Center maintains that section 1823(e) was drafted to apply to cases arising out of a bank's lending function and has never before been understood to negate a security agreement claimed by someone who loaned the bank money—which, of course, is what a depositor does. It is true that the *D'Oench, Duhme* doctrine began as a way to defeat a defense on a note. Section 1823(e) "essentially codifies the *D'Oench, Duhme* doctrine," *Firstsouth,* 858 F.2d at 442 n. 2, and is interpreted in tandem with it. *See, e.g., id.; Twin Constr., Inc. v. Boca Raton, Inc.,* 925 F.2d 378, 382 (11th Cir.1991). The original *D'Oench, Duhme* case involved a debtor who asserted a secret agreement as a defense to a collection suit by the FDIC, but the principle stated in *D'Oench, Duhme* was much broader: "It would be sufficient [to invoke the rule] that the *maker* lent himself to a scheme or arrangement whereby the banking authority on which [the FDIC] relied in insuring the bank was or was likely to be misled." 315 U.S. at 460, 62 S.Ct. at 681 (emphasis added). In time, other applications presented themselves. The *D'Oench, Duhme* doctrine necessarily

---

as we inherit it from the district court squarely poses the question of whether section 1823(e) applies to FSLIC receivership cases.

7. The district court only held that part of the Medical Center's deposit was collateralized by a perfected security interest and that it was not necessary to decide whether the remainder was secured or not. Slip op. at 28. To decide the section 1823(e) issue, we assume for the sake of argument that the entire debt was secured; if the Medical Center loses even if all of its debt was secured, it would certainly lose if its claim was based on an unperformed agreement to perfect the security interest.

extended to cases in which the debtor simply asserted his defense to a debt as a counterclaim: "[D]efenses framed as causes of action must also be barred, because any other result would nullify the doctrine." *Kilpatrick v. Riddle*, 907 F.2d 1523, 1528 (5th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991). The doctrine has also been extended to lender-liability type claims, in which the debtor claims that some action the bank took in connection with a loan (or refusal to make a loan) damaged the debtor; many of the cases the FDIC cites are of this kind. *E.g., Timberland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d 46 (1st Cir. 1991); *Victor Hotel Corp. v. FCA Mortgage Corp.*, 928 F.2d 1077 (11th Cir.1991); *Bowen v. FDIC*, 915 F.2d 1013 (5th Cir. 1990). These cases still pertain to the bank's lending function, as the Medical Center argues.

But there are some cases that do not fit in the Medical Center's debtor/creditor distinction. For instance, in *First State Bank v. City and County Bank*, 872 F.2d 707 (6th Cir.1989), the court applied *D'Oench, Duhme* to bar a claim by a bank that bought a worthless loan participation from the failed bank. Although the case had to do with the bank's lending function, the relation of the claimant to the FDIC was essentially that of a creditor. The district court decision in *Belsky v. First National Life Insurance Co.*, 653 F.Supp. 80, 85 (D.Neb.1986), *aff'd on other grounds*, 818 F.2d 661 (8th Cir.1987), applied section 1823(e) in a case that did not involve a debt to the bank at all. In that case, the former president of a failed bank claimed he had an interest by virtue of an unwritten agreement in an insurance policy the bank carried on his life. The district court applied section 1823(e) to bar the claim. 653 F.Supp. at 84–85.

Thus, although the FDIC has not pointed to a case in which a court applied the *D'Oench, Duhme* doctrine or section 1823(e) to a secured creditor's claim, the Medical Center's distinction between creditor and debtor claims is not borne out in the case law. But far more to the point,

the policies implicit in the statute require no such distinction.

In the pre-FIRREA case of *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the Supreme Court identified the goals of section 1823(e):

One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities, see 12 U.S.C. §§ 1817(a)(2), 1820(b), and when the FDIC is deciding whether to liquidate a failed bank, see § 1821(d), or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank, *see* §§ 1823(c)(2), (c)(4)(A). The last kind of evaluation, in particular, must be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

A second purpose of § 1823(e) is implicit in its requirement that the "agreement" not merely be on file in the bank's records at the time of an examination, but also have been executed and become a bank record "contemporaneously" with the making of the note and have been approved by officially recorded action of the bank's board or loan committee. These latter requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.

*Id.* at 91–92, 108 S.Ct. at 401 (citation omitted). Thus, the purposes of section 1823(e) are to facilitate regulation and protect the FDIC from financial loss by assuring that the bank's financial condition can be assessed instantaneously; to assure that senior bank officials are aware of unusual transactions before the bank agrees to

them; and to prevent collusion between bank employees and customers on the eve of a bank's failure.

The goal of enabling regulators to make accurate assessments of a bank's net worth would be undercut by exempting claims from section 1823(e) simply because they did not pertain to the bank's lending function. The FDIC's picture of the bank's net worth could be just as distorted by hidden liabilities to creditors as by secret agreements that impair the value of a loan.

But though the distinction between claims arising out of the bank's lending function and other types of claims is not significant, there is a more telling distinction between this case and previous section 1823(e) cases. In this case, Guaranty's net worth was not overstated. The existence of the deposits did appear on Guaranty's records, so there was no hidden liability to deceive the regulators about Guaranty's net worth. What was arguably hidden from the regulators was the extent to which Guaranty's assets were encumbered by a pledge or security interest securing a debt they already knew about. The "secret agreement" in this case would not affect Guaranty's net worth, but would affect priorities among creditors—not the size of the pie, but who gets the pieces.

Nevertheless, enforcing a hidden security agreement could hamstring the FDIC in responding to a bank failure. The FDIC frequently chooses to handle a failed bank by using a purchase and assumption transaction instead of liquidating the failed bank. *See generally* Robert W. Norcross, Jr., The Bank Insolvency Game: FDIC Superpowers, The *D'Oench* Doctrine, and Federal Common Law, 103 Banking L.J. 316, 318–19 and nn. 12, 14 (1986). In a purchase and assumption, the FDIC as receiver sells the bank's performing loans to a second bank. The second bank assumes the liability for the bank's deposits in exchange for the good assets and whatever insurance money the FDIC has to pay to make the transaction desirable to the second bank. The FDIC acting as receiver sells the bad loans, which no one else would want, to the FDIC acting in its corporate capacity, in exchange for insurance money. The FDIC in its corporate capacity then tries to recover what it can on the bad loans to offset the money it paid out in insurance. *See generally FDIC v. Aetna Casualty & Sur. Co.*, 947 F.2d 196, 200 (6th Cir.1991); *Timberland Design*, 932 F.2d at 48; *FDIC v. State Bank of Virden*, 893 F.2d 139, 141 (7th Cir.1990). The result of permitting a hidden encumbrance would be that the parties to the purchase and assumption may wind up with an asset that is less valuable than it seemed. Therefore, it would be as intolerable for the FDIC to be deceived about the value of a certain asset as to be deceived about the net worth of the bank.

Another goal of section 1823(e) noted in *Langley* is that of preventing collusion between bank employees and favored customers. That goal is just as well served in this case as in earlier section 1823(e) cases; it would be altogether as serious a matter for bank employees to collude with favored customers to give security interests that reduce assets available for other depositors as for the employees to collude with debtors to forgive them their debts. This possibility of collusion is already dealt with to some extent by the Uniform Commercial Code system of perfection of security interests—but Congress "opted for the certainty of the requirements set forth in § 1823(e)," *Langley*, 484 U.S. at 95, 108 S.Ct. at 403, and it was entitled to do so.

Therefore, applying the requirements of section 1823(e) to test the validity of a security agreement asserted against the FDIC is not only "textually compelled," *Langley*, 484 U.S. at 94, 108 S.Ct. at 402, but also consistent with the purposes of that law. The Medical Center's security agreement does not measure up to the requirements of section 1823(e), and so it is not enforceable against the FDIC.

## IV.

■ The Medical Center argues that retroactive application of FIRREA's amendment to section 1823(e) to deny the Medical Center's priority would constitute an uncompensated taking in violation of the

Fifth Amendment. While we recognize that a security interest would be property within the meaning of the Fifth Amendment, *Armstrong v. United States*, 364 U.S. 40, 44, 80 S.Ct. 1563, 1566, 4 L.Ed.2d 1554 (1960), we conclude that section 1823(e) is not unconstitutional as applied in this case.

The Supreme Court has "eschewed the development of any set formula for identifying a 'taking' forbidden by the Fifth Amendment, and [has] relied, instead on ad hoc, factual inquiries into the circumstances of each particular case." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) (citations omitted). To guide the ad hoc determination, the Court has identified three key factors:

> (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."

*Id.* at 224–25, 106 S.Ct. at 1026 (citations omitted).

These three factors lead us to conclude that there is no Fifth Amendment violation in this case. Although the application of section 1823(e) results in an economic impact on the Medical Center, the Center was dealing in an area that was generally regulated by federal law at the time that it made its "investment" and formed its "expectations." As did the plaintiff in *Connolly*, the party claiming a Fifth Amendment violation in this case had "more than sufficient notice," 475 U.S. at 227, 106 S.Ct. at 1027, that the business of enforcing claims against a failed thrift would be subject to federal regulation. *See Federal Sav. & Loan Ins. Corp. v. Kearney Trust Co.*, 151 F.2d 720, 725 (8th Cir.1945). Finally, as in *Connolly*, the effect of the challenged law is not to line the government's pocket, but to "adjust[ ] the benefits and burdens of economic life to promote the common good." 475 U.S. at 225, 106

S.Ct. at 1026. The FDIC is acting in its receivership, not its corporate capacity, and therefore the effect of denying the priority will generally inure to the benefit of Guaranty's depositors and creditors rather than to the government.[8] *See FDIC v. McClanahan*, 795 F.2d 512, 516 (5th Cir.1986). *See generally* Stephen W. Lake, Note, Banking Law: The *D'Oench* Doctrine and 12 U.S.C. § 1823(e): Overextended, but not Unconstitutional, 43 Okla.L.Rev. 315, 329 & n. 132 (1990). In sum, we hold that applying section 1823(e) to the Medical Center's case does not result in a Fifth Amendment violation.

## V.

The Medical Center makes various other arguments. It attacks the district court's interpretation of FIRREA § 212(i)(1), codified at 12 U.S.C.A. § 1821(i) (West 1989). In light of our holding that section 1823(e) bars the Medical Center from relying on its security agreement, it is unnecessary for us to consider the section 1821(i) ruling.

The Medical Center also argues that the district court erred in dismissing the remaining claims in this suit for lack of subject matter jurisdiction. The court's conclusion that it lacked subject matter jurisdiction followed from its conclusion that it must dismiss the claim against the FDIC, on which federal jurisdiction depended. By upholding the dismissal of the FDIC, we necessarily reject the Medical Center's argument about the remaining claims.

The Medical Center also attacks the district court's entry of partial summary judgment for Bowman. After holding that part of the Medical Center's security interest was perfected, slip op. at 28, the district court dismissed the Medical Center's remaining claims against Bowman, together with the other remaining state law claims, for lack of jurisdiction. Order of June 5, 1990. We see no error in the district court's disposition of the claims against Bowman.

---

**8.** Of course, the FDIC in its corporate capacity may well be a creditor of Guaranty, but the

record is silent on this point.

Furthermore, our holding that section 1823(e) bars the Medical Center's claim against the FDIC makes it unnecessary that we decide the FDIC's cross appeal, which seeks a determination that the common law *D'Oench, Duhme* doctrine would independently bar the Medical Center's claim.

We affirm the judgment of the district court.