**LESAL INTERIORS, INC., Plaintiff,**

v.

**RESOLUTION TRUST CORPORATION,** as Receiver for CorEast Savings Bank, F.S.B., and Colonial DPC Corp. I, Defendants.

Civ. A. No. 91–2595 (SSB).

United States District Court,
D. New Jersey.

Oct. 25, 1993.

H. Thomas Hunt, III, Haddonfield, NJ, and Richard Eisenberg, Speno Goldman Goldberg Steingart & Penn, Mineola, NY, for plaintiff.

Ann F. Kiernan, Jamieson Moore Peskin & Spicer, Princeton, NJ, for Resolution Trust Corp., as Receiver for defendant CorEast Sav. Bank, F.S.B., and for defendant Colonial DPC Corp. I.

## OPINION

BROTMAN, Senior District Judge:

### I. Introduction

In this case, tried to the bench on May 24, 1993, plaintiff Lesal Interiors, Inc. ("Lesal") seeks to recover the balance of payments, amounting to $780,000, owed for work done in 1989 under a construction contract for the renovation of an apartment complex in Vorhees, New Jersey. Upon the present posture of this case, Lesal attempts to obtain this sum, not from the party that hired it to perform the renovation work, but rather from a bank and its subsidiary.

In July 1990, Lesal brought suit in New Jersey Superior Court against Echelon Glen Cooperative, the Michael defendants, Cor-East, Colonial, and other parties. In the original complaint, Lesal sought recovery only from Echelon Glen Cooperative and the Michael defendants. As against the other defendants in the case, including CorEast and Colonial, Lesal's only claim was to estab-

lish the priority of its alleged mechanic's lien over the interests of these defendants.

On February 1, 1991, the Office of Thrift Supervision declared CorEast insolvent, and appointed the Resolution Trust Corporation ("RTC") as the receiver for CorEast.[1] On April 19, 1991, the New Jersey Superior Court substituted the RTC in the action as the receiver for CorEast. On May 9, 1991, the RTC removed the case to federal district court in the District of Columbia. The case was then transferred to the District of New Jersey in June 1991.

On May 3, 1992, the court granted Lesal leave to file an amended complaint, which was filed on May 14, 1992. In the amended complaint, Lesal added the following claims against CorEast and/or Colonial for recovery of the $780,000 due under the renovation contract; count V alleged that Lesal is subrogated to Echotree's rights against Colonial under the Settlement Agreement; count VI alleged that Colonial is liable in quantum meruit to Lesal for the value of Lesal's renovation work; count VII predicated Colonial's liability on a theory of unjust enrichment; count VIII alleged that Lesal is the third-party beneficiary of the Settlement Agreement; count IX alleged that Colonial is an alter ego of CorEast, thus making CorEast liable for any debts, obligations, or liabilities owed by Colonial to Lesal; count X alleged that CorEast is liable for the monies due under the renovation contract on a theory of promissory estoppel; and count XI alleged that CorEast, Colonial, and other defendants are liable for fraud.

On November 25, 1992, the court entered a default judgment in favor of Lesal against the Michaels defendants, jointly and severally, in the amount of $778,000, plus costs and interest.[2] On March 30, 1993, the court entered an opinion and order granting CorEast's and Colonial's motion for summary judgment with respect to counts V, VI, VII, and X of the amended complaint. The court,

1. For the sake of clarity, the opinion will continue to refer to CorEast.

2. The default judgment order also stated that "in the event Lesal obtains judgment in this action against defendants other than the Michaels defendants, Lesal shall not recover an amount

greater than $778,000, plus statutory interest and costs, ·from all the defendants in this action, provided, however, that nothing in this order shall preclude claims among the defendants for contribution or indemnification."

however, denied the motions with respect to counts VIII, IX, and XI, thus allowing Lesal's third-party beneficiary, fraud, and alter ego theories to proceed to trial. On April 23, 1993, Lesal filed a motion to compel turnover of funds.

On May 24, 1993, a one-day trial was held before the bench. After careful consideration of the entire record in this matter, the court enters the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II. Findings of Fact

### A. The Parties and Principal Individuals

1. Plaintiff Lesal is a New York corporation having its principal place of business located at 212–11 99th Avenue, Queens Village, New York. Lesal is in the business of performing interior renovations, principally for large apartment upgrades and condominium or cooperative conversions. Jt. Final Pretrial Order, Stipulated Facts ("JFPO Stip.") ¶¶ 1, 8.

2. Echelon Glen Cooperative, Inc., is a corporation organized and existing under the New Jersey Cooperative Recording Act, N.J.Stat.Ann. § 46:8D–1 et seq., having its principal place of business at 1 Van Buren Road, Voorhees, New Jersey. JFPO Stip. ¶ 2.

3. Defendant Echotree Associates, L.P. ("Echotree"), is a New Jersey limited partnership. Echotree is no longer an operating business. JFPO Stip. ¶ 3.

4. Defendant HLM/Echotree, Inc., is the general partner of Echotree and is a New York corporation. HLM/Echotree is no longer an operating business. JFPO Stip. ¶ 4.

5. Defendant CorEast Savings Bank ("CorEast") is a federally chartered savings bank. CorEast is no longer an operating entity, the Resolution Trust Company ("RTC") having assumed control of CorEast pursuant to 12 U.S.C. §§ 1441a et seq. in January 1991. JFPO Stip. ¶ 5.

6. Defendant Colonial DPC Corporation I ("Colonial") is a Virginia corporation formed in May 1990. JFPO Stip. ¶ 6.

7. Gary Sherwood is president of Lesal. The court finds Sherwood's testimony to be credible, except in regard to the alleged October 1989 oral agreement between Lesal and CorEast. See infra Findings of Fact ¶ 15.

8. Howard Michaels, during the events giving rise to this litigation, was the managing general partner of Echotree.

9. Linda Kolachny, from June 1990 through August 1991, was a CorEast Vice President and, for a lesser time within that period, also an officer of Colonial. Kolachny Dep. at 7–8, 45–47, 213.

### B. The Echelon Glen Conversion Project

10. Echotree was the owner of a property in Voorhees, New Jersey, located on which are a series of buildings known as the Echelon Glen Apartments. By December 1989, Echotree undertook a project to convert the Echelon Glen apartments to cooperatives. Defendant CorEast, among others, provided the financing for this conversion project. JFPO Stip. ¶¶ 7, 9, 18.

11. As part of the cooperative conversion project, Echotree hired Lesal in December 1989 to renovate 110 apartments at the Echelon Glen complex for a contract price of $1,536,000. In addition to the base work, Lesal performed further work under change orders for a price of $390,000. Pl.'s Ex. 2. Lesal commenced work in January 1989 and substantially completed its work by October 1989. JFPO Stip. ¶¶ 10, 11.

12. The total amount due for Lesal's work is $1,926,000. Echotree has paid Lesal $1,148,000, leaving a balance due of $778,000. Pl.'s Ex. 2.

13. On February 3, 1989, Echotree conveyed the underlying fee in the property to Echelon Glen Cooperative, Inc. Echotree retained a beneficial interest in Echelon Glen in the form of proprietary leases in the cooperative units and shares in the cooperative association, Echelon Glen Cooperative. JFPO Stip. ¶ 12.

## C. The October 1989 Meeting

14. By October 1989, Lesal had attempted three times to arrange a meeting with Michaels in order to attempt to arrange payment on the monies still due to Lesal. Once these attempts failed, Lesal insisted on a meeting with the construction lender, CorEast. This meeting took place at the CorEast Savings Bank's offices on the east side of Manhattan in New York City. Testimony of Sherwood. At this meeting, HLM Echotree and Lesal reached an agreement of $690,000 as the "settlement" amount for Lesal's claim. Pl.'s Exs. 3, 4.

15. Plaintiff Lesal has failed to prove by a preponderance of the evidence that, at the October 1989 meeting, CorEast assured Lesal that Lesal would be paid, and that officers of CorEast shook Sherwood's hand on this agreement. There are two reasons for this finding. First, none of the documentation memorializing the October 1989 meeting mentions this alleged agreement between Lesal and CorEast. *See* Pl.'s Exs. 3, 4; *see also* Testimony of Sherwood (admitting that there was no written confirmation from CorEast). Second, Sherwood testified that he shook hands with Stu Wiener and Linda Kolachny, as representatives of CorEast, on the alleged agreement. However, this raises a serious credibility problem because Kolachny only first became employed by CorEast in mid-June of 1990. Kolachny Dep. at 7. Therefore, Kolachny could not have been at the October 1989 meeting to shake hands with Sherwood as a representative of CorEast.

## D. The Settlement Agreement

16. The Echelon Glen conversion project failed in June 1990.

17. As part of the workout of the loan relationship between Echotree and CorEast, CorEast formed Colonial DPC I Corporation ("Colonial"), a Virginia corporation, in May 1990. JFPO Stip. ¶ 14.

18. CorEast and Colonial entered into a Settlement Agreement with the Michaels entities on June 25, 1990. *See* Jt. Ex. 1 ("Settlement Agreement"). The Settlement Agreement provided, *inter alia,* that Colonial became the owner of the unsold shares and proprietary leasing rights to 515 apartment units then owned by the sponsor. In return, CorEast released the Michaels entities from more than $6 million in existing debt. CorEast also capitalized Colonial with $6 million in loans.

19. Lesal was unaware of the Settlement Agreement at the time of its making, and did not participate in its drafting or execution. JFPO Stip. ¶¶ 24, 25.

20. The Recital to the Settlement Agreement provides that "[Colonial] shall agree to ... pay on behalf of Echotree, or indemnify Echotree against, certain expenses incurred by Echotree with respect to the property." Settlement Agreement at 4.

21. Paragraph 6 obligated Colonial to "pay on behalf of Echotree, its partners and principals ... construction payables, in an amount not to exceed $1,180,000...." Paragraph 6 also authorized Colonial to "negotiate, litigate or settle" with each of the specifically identified creditors shown in Schedule[ ] C, including Lesal, "as Buyer [Colonial] wishes, in it sole discretion."

22. Under Paragraph 7 of the Settlement Agreement, CorEast "agreed to make a loan to [Colonial] to finance ... the construction payables."

23. The Settlement Agreement defined "construction payables" in Schedule C, which is entitled "Echotree Associates Construction Payables." The first item on the list of construction payables in Schedule C is "Lesal Interiors—amount completed $690,000—total $690,000".

24. Paragraph 22 of the Settlement Agreement provides:

The paragraph headings used in this Agreement are for the convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

25. Paragraph 25 of the Settlement Agreement, entitled, "The Entire Agreement," states:

This Agreement contains the entire agreement and understanding between the parties and supersedes all prior memoranda,

term sheets, agreements, and understandings between the parties relating to the subject matter thereof.

26. Paragraph 28 of the Settlement Agreement, entitled "No Third Party Beneficiaries," states:

This Agreement and the other Documents are solely for the benefit of the parties hereto, and may not be relied by [sic] any other persons or entities including, without limitation, any present or future creditors of Buyer, Echotree, or Michaels.

### E. The Parties' Understanding of the Terms of the Settlement Agreement

#### 1. CorEast's Understanding

27. Linda Kolachny testified that as of June 25, 1990, the date of the signing of the Settlement Agreement, she understood that Colonial would undertake to quantify and resolve certain scheduled liabilities of the property. Kolachny Dep. at 50.

28. In a document entitled "Echotree Settlement Transaction," which appears to have been generated around the time of the signing of the Settlement Agreement, CorEast summarized its understanding of the terms of the Settlement Agreement. On page 3, the document stated the "Obligations of CorEast Savings Bank, FSB" to include "Make a 'New Loan' to Colonial DPC Corp. I to finance the following items arising from and after the closing of the Settlement Transaction: ... Obligations incurred for 'Construction Payables', not to exceed $1,180,000." Pl.'s Ex. 9.

29. In a memorandum dated June 28, 1990 from Linda Kolachny and Susan Nutkis (the CorEast employees assigned to handle the Michaels entities) to Roger Goldman (the executive vice president of CorEast) Kolachny and Nutkis identified "Construction Payables" as an amount due under the Settlement Agreement. Pl.'s Ex. 5.

30. In a July 2, 1990 letter to Howard Michaels, Kolachny specifically itemized the debts due on the Echelon Glen Project, including the amount due to Lesal, in the sum of $690,000. Pl.'s Ex. 6.

31. On January 29, 1991, Kolachny summarized the Echelon closing in a memorandum to Stuart Weiner, a senior vice president. On page 3 of this memorandum, Kolachny identifies "[i]tems remaining to be completed as I was aware of at that time." The ninth item on this list is "Follow up on litigation items: ... Lesal—status unknown/pending". Pl.'s Ex. 7.

#### 2. Colonial's Understanding

32. Colonial never issued a corporate resolution approving the Settlement Agreement.

33. Because Linda Kolachny was also a member of the board of directors of Colonial, all of the above described evidence relating to her understanding of the relevant terms of the Settlement Agreement are attributable to Colonial.

34. In addition, Kolachny evidenced her understanding of the obligation of Colonial vis-a-vis Lesal by her resignation in July 1991 from her position as an officer of Colonial. According to her deposition testimony, Kolachny resigned because of her concern about potential personal liability. Kolachny Dep. at 207–08. In a memorandum dated July 17, 1991, Kolachny explained her reasons for resigning from the Echelon Glen Cooperative Board:

there are several legal actions in process, i.e. foreclosure proceedings by American Savings Bank, Fenderson case, *Lesal*, etc. The legal actions which are pending, together with the Cooperative's financial condition, present a personal exposure and liability problem to us individually.

Pl.'s Ex. 10 (emphasis added). It is fair to infer from Kolachny's testimony that her reasons for resigning from the Echelon Glen Cooperative Board were the same as her reasons for resigning from Colonial. Kolachny Dep. at 208.

#### 3. Michaels's Understanding

35. Michaels's understanding of the relevant terms of the Settlement Agreement is evidenced in a letter, dated May 10, 1991, to the RTC claims department. In this letter, Michaels states:

The Settlement Agreement also provided for CorEast's agreement to assume liability for certain expenses as defined in the

Settlement Agreement, and indemnify, defend and hold the partnership harmless in connection with certain outstanding obligations, including litigation, also as defined in the Settlement Agreement. A copy of the Settlement Agreement, with its exhibits which specify the payables (both construction and partnership) for which CorEast is responsible as well as litigation in connection with which CorEast must indemnify, defend and hold the Partnership harmless, is attached hereto....

Pl.'s Ex. 8.

### F. The Relationship Between CorEast and Colonial

36. CorEast is the former parent corporation of Colonial and former sole owner of Colonial's stock. While a CorEast subsidiary, Colonial worked out of the offices of CorEast, alternatively in Virginia and Manhattan.

37. Most or all of Colonial's officers and directors were also full-time CorEast employees and/or agents. Kolachny Dep. at 46, 64, 73, 86–87, 105, 111, 180.

38. Colonial conducted separate board meetings, but, prior to the RTC takeover in January, 1991, apparently maintained no corporate minutes.

39. Colonial's balance sheet and statement of operations for December, 1990, indicate that Colonial never maintained its own bank account while it was a CorEast subsidiary, and that Colonial had no income or employees, paid no rent, incurred no office expenses, and paid no taxes. Jt.Ex. 2.

40. Colonial is no longer a subsidiary of CorEast. Pursuant to a transfer and assignment agreement, the shares of Colonial are now held by Polis Housing Foundation VI, a New Jersey nonprofit corporation; Colonial has been converted to a New Jersey nonprofit corporation. Jt.Exs. 3–5.

### III. Conclusions of Law

The court has jurisdiction over this matter pursuant to 12 U.S.C. § 1441a(a)(11) and 28 U.S.C. § 1331, as this lawsuit is an action to which the RTC, as receiver for CorEast, is a party and is therefore deemed to arise under the laws of the United States. Venue in the District of New Jersey is proper pursuant to 28 U.S.C. § 1391(e)(2).

### A. The *D'Oench Duhme* Doctrine

Before turning to the merits of plaintiff's three claims, the court must first address a threshold legal issue raised by defendants CorEast and Colonial. Defendants contend that the doctrine embodied in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and 12 U.S.C. § 1823(e) bar Lesal's remaining claims of third-party beneficiary status, fraud, and alter ego liability. Consideration of the scope of the *D'Oench* doctrine is thus first necessary so as to inform this court's disposition of plaintiff's substantive claims.

In *D'Oench*, the defendant executed a demand note with a bank, but with the understanding that the bank would never enforce the note. The purpose of this arrangement was to artificially inflate the bank's assets. The arrangement, however, was never reduced to a writing and placed in the bank's files. Several years later, the bank met with difficulties and the FDIC acquired the note. When the FDIC attempted to collect on it, the defendant raised the side agreement with the bank as a defense. The Supreme Court held the defendant was estopped from asserting such a defense. Drawing upon federal common law, the Court noted the existence of "a federal policy to protect [the FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." *D'Oench*, 315 U.S. at 457, 62 S.Ct. at 679.

> The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.

*Id.* at 460, 62 S.Ct. at 680. "The rule emerging from *D'Oench Duhme* is that no agreement between a borrower and a bank which does not plainly appear on the face of an

obligation or in the bank's official records is enforceable against the FDIC." *Adams v. Madison Realty & Development, Inc.,* 937 F.2d 845, 852 (3d Cir.1991).

In 1950, Congress enacted 12 U.S.C. § 1823, which effectively codified the principle announced in *D'Oench.* Under section 1823(e):

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or Section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement:
>
> (1) is in writing,
>
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e). Congress has extended the application of section 1823(e) to the RTC. *See* 12 U.S.C. § 1441a(b)(4).

Plaintiff argues that the *D'Oench* doctrine and its statutory counterpart are inapplicable in the instant case. First, plaintiff contends that the *D'Oench* doctrine is only available to counter affirmative defenses raised by borrowers, typically in loan disputes, and cannot be used to deflect affirmative claims brought by creditors. Second, plaintiff contends that

the doctrine as codified in section 1823(e) is only intended to arise in cases involving a specific asset, such as a loan or mortgage, and is unavailable in cases where the general assets of a bank are at stake. Both of these arguments, addressed respectively below, are unavailing for the plaintiff.

■■ Before considering plaintiff's arguments, it should be noted that the scope of the *D'Oench* doctrine as codified by section 1823(e) is quite broad.[3] Subsequent to the Supreme Court's interpretation of section 1823(e) in the case of *Langley v. Federal Deposit Ins. Corp.,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), "agreement[s]" that fall under the protective shield of section 1823(e) include "any warranty on which the performance of a party is conditioned." *Adams,* 937 F.2d at 857. Significant policy concerns underlie this broad shield. As the Eighth Circuit has explained, "the purposes of section 1823(e) are to facilitate regulation and protect [federal receivers] from financial loss by assuring that the bank's financial condition can be assessed instantaneously; to assure that senior bank officials are aware of unusual transactions before the bank agrees to them; and to prevent collusion between bank employees and customers on the eve of a bank's failure." *North Arkansas Medical Center v. Barrett,* 962 F.2d 780, 788–89 (8th Cir.1992).

■ In light of these objectives, the court now turns to plaintiff's two contentions. Plaintiff's first claim—that *D'Oench* is limited to rebutting affirmative defenses raised by borrowers—is unsupported by the caselaw. *Tuxedo Beach Club Corp. v. City Federal Savings Bank,* 749 F.Supp. 635 (D.N.J. 1990), upon which plaintiff relies in support of this proposition, acknowledges that

---

**3.** The litigants' briefs on this issue alternate between the common law *D'Oench* doctrine and its statutory counterpart somewhat arbitrarily. This court acknowledges that the two are not identical, as has been observed by other courts. *E.g. FDIC v. McClanahan,* 795 F.2d 512, 514 (5th Cir.1986). The notable distinction is that, while § 1823(e) generally expands *D'Oench,* "the statute is also narrower than *D'Oench* in that it applies only to agreements...." *Agri Export Co-Op v. Universal Sav. Assn.,* 767 F.Supp. 824, 834 (S.D.Tex.1991).

There is no dispute in the instant case over whether *D'Oench* and section 1823(e) are being utilized by defendants to avoid enforcement of an agreement—indeed, the third-party beneficiary and fraud claims both hinge on claims of alleged agreements. Thus, in regard to the matter at hand, arguments for and against application of section 1823(e) can generally be read as relating as well to the common law doctrine. Where specific arguments are aimed only at one in particular, however, this opinion has so noted.

*D'Oench* "applies to any defense that a borrower may assert," but does not limit the doctrine to that context. On the contrary, several circuits have held that the doctrine applies to creditor claims as well as borrower defenses. *See Barrett,* 962 F.2d at 788; *Adams,* 937 F.2d at 857–58; *Twin Constr., Inc. v. Boca Raton, Inc.,* 925 F.2d 378, 382 (11th Cir.1991). The rationale, as explained by the Sixth Circuit, is straightforward enough: "If ... *D'Oench* did not apply to bar the introduction of evidence of a side agreement in a claim against [a federal receiver], then an obligor could circumvent the sound policy behind *D'Oench* by asserting as a counterclaim that which could not be asserted as an affirmative defense." *Hall v. FDIC,* 920 F.2d 334 (6th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991). Thus, this first contention is meritless; this court hereby acknowledges that the common law *D'Oench* doctrine is available as a defense to affirmative creditor claims in addition to its availability as a rebuttal to a borrower's affirmative defenses.[4]

■ Plaintiff's second contention is that the *D'Oench* doctrine as codified in section 1823(e) only applies in claims asserted against specific bank assets. In support of this contention, plaintiff relies on the language of the statute—which extends the reach of section 1823(e) to agreements that tend to "diminish or defeat the interest of the [RTC] in any *asset* acquired by it...." 12 U.S.C. § 1823(e) (emphasis added)—and on several cases in which courts have similarly interpreted this statutory language. In *Vernon v. Resolution Trust Corp.,* 907 F.2d 1101 (11th Cir.1990), plaintiff-appellants sought to obtain payment from the general assets of a savings and loan institution for damages sustained due to the alleged tortious acts of a third-party failed savings and loan institution whose assets had been purchased by the defendant institution through the RTC. The *Vernon* court distinguished the facts before it from typical *D'Oench* disputes involving "the validity or enforceability of a particular debt or monetary obligation," and ultimately declined to extend *D'Oench* or section 1823(e) "to preserve all assets" of an institution from potential tort liability. *Id.,* at 1107–08. The court reasoned that tort claims "might not appear in the books of a failed bank and yet easily be shown to be valid." *Id.,* at 1108.

■ Following the lead of *Vernon,* several courts have refused to extend *D'Oench* or section 1823(e) to cases in which plaintiffs seek to collect from the general assets of an institution for alleged breaches of "what might be characterized as a pure obligation of the failed bank or savings and loan association." *Agri,* 767 F.Supp. 824, 832 (holding *D'Oench* inapplicable to claim against defunct savings and loan for failure to honor letter of credit); *see also Ramins & Sons, Inc. v. Bell Sav. Bank, S.A.,* No. 92–4919, 1993 WL 210551, 1993 U.S.Dist. LEXIS 7979 (E.D.Pa. June 16, 1993) (following *Agri*). The same reasoning has been invoked in cases involving "straightforward obligation[s] allegedly owed" by a defunct institution's subsidiary. *Beener v. LaSala,* 813 F.Supp. 303, 309 (D.N.J.1993) (declining to extend *D'Oench* to claim against third-generation subsidiary of failed bank for alleged breach of agreement to pay brokerage fees). These courts have reasoned that extending *D'Oench* and section 1823(e) to direct obligations of institutions that are unrelated to identifiable assets— such as a mortgage or promissory note— would contravene both public interest concerns and the intent of the doctrine. *See Beener,* 813 F.Supp. at 310; *Agri,* 767 F.Supp. at 834.[5]

---

4. Of course, even were we to hold otherwise, it is undisputed among the instant litigants that section 1823(e) applies to both claims and defenses and, as such, provides an independent route for defendants. This conclusion is validated by Congress's enactment of 12 U.S.C. § 1821(d)(9)(A) (a subsection of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989). This subsection clarifies that an "agreement which does not meet the requirements set forth in [12 U.S.C. § 1823(e) ] shall not form the basis of ... a claim against the receiver or the [RTC]." 12 U.S.C. § 1821(d)(9)(A); *see also Thigpen v. Sparks,* 983 F.2d 644, 647–48 (5th Cir.1993) (distinguishing between section 1821(d)(9)(A) and section 1823(e)).

5. The court in *Beener,* in distinguishing "straightforward" obligations of a bank from side agreements to specific asset transactions that more typically underlie *D'Oench* cases, also noted that the former are not "secret" agreements "of the

■ Notwithstanding these precedents, plaintiff's contention that the instant case does not involve a specific asset, and therefore falls outside the scope of *D'Oench* and section 1823(e), fails for two reasons. First, and contrary to plaintiff's unsupported position, a bank's wholly-owned subsidiary—as Colonial was to CorEast in this case—is an "asset" of a bank for purposes of *D'Oench* and 1823(e), and is therefore entitled to the doctrine's protection. *See Victor Hotel Corp. v. FCA Mortgage Corp.*, 928 F.2d 1077, 1083 (11th Cir.1991) (noting that receivers must "rely on a financial institution's written records and its assets, such as wholly-owned subsidiaries, to determine solvency for regulatory purposes"); *accord Oliver v. Resolution Trust Corp.*, 955 F.2d 583, 585 (8th Cir.1992). Accordingly, inasmuch as section 1823(e) requires the existence of an agreement tending to diminish the RTC's interest in an "asset," an agreement allegedly made by a wholly-owned subsidiary of a failed institution that potentially diminishes the RTC's interest in that subsidiary satisfies the statute.[6]

■ Second, the Eleventh Circuit has recently revisited the issue of specific versus general assets and in so doing has significantly narrowed its holding in *Vernon*. In *OPS Shopping Center, Inc. v. FDIC*, 992 F.2d 306 (11th Cir.1993), the court held that the *D'Oench* doctrine barred an action against the FDIC involving a failed bank's alleged general liability for a claim that was unrelated to a specific bank asset. In reaching its holding, the *OPS* court distinguished "free standing torts which do not implicate the records of regular banking transactions"—as seen in *Vernon*—from claims relating to more ordinary banking transactions. *Id.*, at 310. The court concluded:

> [W]e do not believe that the *Vernon* holding should be extended to exempt from the *D'Oench* doctrine claims which relate directly to regular banking transactions and which should be reflected in the records of regular banking transactions. The central purpose of the *D'Oench* doctrine requires that bank examiners be permitted to rely upon the bank's records of regular banking transactions. To extend the *Vernon* holding to cases involving regular banking transactions ... would undermine the central purpose of the *D'Oench* doctrine. In addition, the failure to apply the *D'Oench* doctrine in [cases involving regular transactions] would undermine the second purpose of the *D'Oench* doctrine—to ensure mature consideration of banking transactions by senior bank officials and to prevent fraud and collusion with employees of troubled banks.

*Id.*, at 311. Thus, while the *OPS* court preserved the *Vernon* holding to the extent that it denied *D'Oench* application to free standing tort claims unrelated to specific bank assets, the court rejected the specific asset requirement for cases not involving free standing torts. The *OPS* court further observed that, outside of *Vernon*'s narrow confines, the circuit courts that have addressed the issue have uniformly rejected a categorical restriction of *D'Oench* to cases relating to specific bank assets. *See, e.g., Jackson v. FDIC*, 981 F.2d 730, 734–35 (5th Cir.1992); *Barrett*, 962 F.2d at 788–89; *Hall*, 920 F.2d at 339.

■ In the instant case, the alleged liability of defendants clearly does not stem from a free standing tort claim; rather, it relates to (1) a written contract between defendants and the Michael's entities—notably arising from a typical lender-borrower relationship—to which plaintiff claims third-party beneficiary status, and (2) an alleged oral agreement between defendants and plaintiff in which defendants allegedly promised to pay plaintiff moneys owed under the original construction contract between plaintiff and

---

sort described in *D'Oench*." Yet section 1823(e) is not limited to such agreements. As observed by the court in *Agri*, one of the cases relied upon in *Beener*, section 1823(e) "expands *D'Oench* in that it applies to any agreement, whether or not it was "secret", and regardless of the makers [sic] participation in a scheme...." *Agri*, 767 F.Supp. at 834.

6. Plaintiff also contends that the language of section 1823(e)(2) indicates that a failed institution cannot itself be considered an "asset" under the statute. Since this theory is not propounded by defendants, it need not be addressed further.

Echotree—in sum, an alleged oral guarantee of a defaulted borrower's debt. These claims are distinct from that involved in *Vernon* and are typical of the type of claim described in *OPS* as being properly subjected to *D'Oench* and section 1823(e). *See OPS,* 992 F.2d at 309–11.[7] Accordingly, this court concludes that *D'Oench* and section 1823(e) are applicable in the instant case.[8]

### B. Lesal's Third–Party Beneficiary Claim

■ In count VIII of the amended complaint, Lesal claims that it is a third-party beneficiary of the Settlement Agreement between Colonial and Echotree, entitling it to enforce directly against Colonial the Agreement's provision for payment of construction payables. Having determined that *D'Oench* and section 1823(e) apply, the relevant inquiry now to be addressed is whether Lesal's third-party beneficiary claim under the Settlement Agreement meets the requirements of the *D'Oench* doctrine as codified in section 1823(e).

Defendants maintain that this claim fails under section 1823(e) because (1) the Settlement Agreement is an insufficient "writing," *see* 12 U.S.C. § 1823(e)(1); (2) the Settlement Agreement was not executed by Lesal, the party claiming an interest adverse to Colonial, *see* 12 U.S.C. § 1823(e)(2); and (3) the Settlement Agreement was not approved by Colonial's board of directors, *see* 12 U.S.C. § 1823(e)(3). These arguments, at least two of which are deemed meritorious, are considered in turn.

First, defendants argue that the Settlement Agreement does not meet the requirement of "*explicit documentation* evidencing [Colonial's] *obligation* to transfer specific" monies to Lesal. *Federal Deposit Ins. Corp. v. McCullough,* 911 F.2d 593, 601 (11th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). This court construes defendant's argument as a challenge to the enforceability of the Settlement Agreement under the "writing" requirement of 12 U.S.C. § 1823(e)(1), and, informed by the *McCullough* court's analysis, agrees that the relevant provisions of the Settlement Agreement are insufficient to satisfy the statute.

Indeed, the Settlement Agreement is ambiguous both as to whether Lesal was an intended third-party beneficiary and as to whether Colonial specifically agreed to pay the $690,000 owed to Lesal. Regarding the former, as this court observed in its March 30, 1993 opinion, "the no-reliance language of Paragraph 28 [of the Settlement Agreement] is sufficiently unclear to make the contract ambiguous on the issue of whether a third party may assert a claim under the contract." What is clear, however, is that the language of this section is not sufficient to have put the RTC on notice that, upon taking over Cor-East as receiver, it would be vulnerable to a third party claim under the Settlement Agreement between Colonial and Echotree. *See supra* Findings of Fact ¶ 26. Thus, the underlying purpose of section 1823(e) would be frustrated by finding the writing in question to be sufficient under the statute.

---

**7.** The Fifth Circuit has in two recent holdings adopted a stance that would broaden what is left of *Vernon* 's holding. In *Thigpen,* a breach of warranty action against a failed bank, the court held section 1823(e) inapplicable to "nonbanking-related transaction[s]." 983 F.2d at 649. In *Alexandria Associates, Ltd. v. The Mitchell Company,* 2 F.3d 598 (5th Cir.1993), the court extended the *Thigpen* holding to the common law *D'Oench* doctrine. Reading *Vernon* and these two Fifth Circuit cases in tandem suggests a rule that would penetrate the *D'Oench* shield not only for free-standing tort claims unrelated to specific bank assets, but for all disputes arising from nonbanking transactions.

The instant case, however, falls outside the scope of these new exceptions to the doctrine.

The factual bases of the third-party beneficiary and fraud claims respectively involve (1) the settlement of a lender-borrower relationship, and (2) a bank's alleged guarantee of a borrower's debt to a third-party. These are regular banking transactions, distinct from the transaction in *Alexandria,* for example, which involved a bank subsidiary's commercial sale of a partnership interest in a real estate development venture. *Alexandria Assocs.,* 2 F.3d 598.

**8.** A district court in the First Circuit recently reached this same conclusion in a case with very similar facts to those involved in the instant matter. *See Raymond L. Sabbag, Inc. v. FDIC,* No. CIV.A. 90–12797–Z, 1991 WL 146876 (D.Mass. July 26, 1991).

Regarding the latter ambiguity—whether under the Settlement Agreement Colonial committed to pay $690,000 to Lesal—the relevant provisions here too are insufficient to constitute a writing under section 1823(e)(1). Far from the "explicit documentation" evidencing a "fixed commitment" as required in *McCullough,* 911 F.2d at 601, the relevant provisions of the Settlement Agreement expressly avoid a fixed commitment.[9] In light of these ambiguities, the court finds that the Settlement Agreement is an insufficient writing for purposes of section 1823(e).

■ Unfortunately for Lesal, whatever findings this court reached above evidencing an understanding on the part of CorEast and/or Colonial employees that an obligation to Lesal existed, such impressions are unavailing for Lesal under the *D'Oench* doctrine. As discussed above in some detail, the very purpose of the doctrine is to limit the liability of federal receivers to *written agreements* plainly visible to the receivers. *See Barrett,* 962 F.2d at 788–89 (noting import of receivers' ability to "assess[ ] instantaneously" the financial condition of failed institutions).[10]

■ Defendants' second contention is that Lesal's nonparticipation in the execution of the Settlement Agreement makes the agreement invalid against the RTC pursuant to section 1823(e)(2). That section requires execution of the agreement by the bank and "by any person claiming an adverse interest," and requires such execution to occur contemporaneously with the bank's acquisition of the asset in question. Plainly, Lesal in this case constitutes the "person claiming an adverse interest" under the Settlement Agreement. As such, that Lesal did not participate in the execution of the Settlement Agreement precludes it from enforcing the agreement against defendants.

Lesal contends that contemporaneity is the sole focus of this section and that the identity of the signing party—be it the original obligor or a third-party beneficiary—is irrelevant. This interpretation, while colorable, is supported by no law whatsoever and, additionally, seems contrary to the intention of the *D'Oench* doctrine; that is, leaving the door open to innumerable third-party claimants would seemingly frustrate the purpose that *D'Oench* and section 1823(e) serve in assuring that federal receivers are immediately aware of the vulnerability associated with a newly acquired asset. This court thus concludes that section 1823(e)(2) also bars Lesal's claim.

■ Defendants' third contention is that section 1823(e)(3) also makes the Settlement Agreement invalid against the RTC because Colonial's board of directors never approved the Settlement Agreement.[11] Lesal stipulates in its "Proposed Findings of Fact" that Colonial never formally approved the Settlement Agreement. Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law ¶ 34. However, Lesal contends that such inaction is irrelevant since the statute only demands approval by the "depository institution or its loan committee," 12 U.S.C. § 1823(e)(3), making the requirement inapplicable to transactions involving a bank's wholly-owned subsidiary rather than the bank itself. This is likely an unduly literal reading of the statute. Inasmuch as section 1823(e) has been extended to transactions involving wholly-owned subsidiaries, *see Victor,* 928 F.2d at 1083, it is logical to conclude that "wholly-owned subsidiary" should be read into the statute—in place of "depository institution"—where the agreement in question was entered into by the subsidiary and not the depository institution. So interpreted, this subsection of the statute would bar Lesal's claim as defendants contend. Yet

9. As noted in the above Findings of Fact, Paragraph 6 of the Settlement Agreement authorized Colonial to "negotiate, litigate or settle" with each of the specifically identified creditors shown in Schedule[ ] C, including Lesal, "as Buyer [Colonial] wishes, in its sole discretion." *See supra* Findings of Fact ¶ 21.

10. It is in furtherance of this policy that lawmakers have "placed the burden on private parties to document fully the contours of their obligations from the inception of [a] transaction." *Baumann,* 934 F.2d at 1517.

11. Section 1823(e)(3) provides that the agreement in question must be "approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee."

given this ambiguity, and because sections 1823(e)(1) and 1823(e)(2) both make Lesal's third-party beneficiary claim under the Settlement Agreement unenforceable against the RTC, this court refrains from definitively holding that section 1823(e)(3) independently bars Lesal's claim.

### C. Lesal's Fraud Claim

 In count XI of the amended complaint, Lesal claims it was defrauded by the alleged oral misrepresentation made by a CorEast representative in the fall of 1989, assuring Lesal that it would be paid for its renovation work. As this claim necessarily relies upon a non-written representation, it too falls within the scope of *D'Oench* and section 1823(e).

Lesal may wish to characterize this claim as involving a free standing tort, and accordingly argue that under *Vernon* it is immune from *D'Oench* and section 1823(e). Such a contention, however, would miss the point of the court in *OPS,* which, in this court's view, did not intend to exclude fraud claims relating to a bank's alleged promise of payment on behalf of a defaulted borrower from the shield of the *D'Oench* doctrine. *See OPS,* 992 F.2d at 310–11 (distinguishing "free standing tort claims" from claims "arising out of regular banking transactions").

Regardless, this court's factual inquiry independently leads to the conclusion that Lesal's fraud claim is without merit. As addressed in the above Findings of Fact, Lesal has failed to prove by a preponderance of the evidence that CorEast committed a fraud. *See supra* Findings of Fact ¶ 15.

### D. Lesal's Piercing the Corporate Veil Claim

Plaintiff's remaining claim, count IX of the amended complaint, is to pierce Colonial's corporate veil in order to reach CorEast. According to defendants, *D'Oench* and section 1823(e) bar this theory of liability because there is no written agreement in which CorEast agreed to be liable for the debts and obligations of Colonial.

This is an interesting issue—not only in regard to the substantive merits but also in regard to whether state law or federal common law should govern—but one that this court need not address. Since Colonial has not been found liable on any count, it is unnecessary for this court to determine whether CorEast would be derivatively liable on an alter ego theory.

### E. Conclusion

For the forgoing reasons, this court finds for the defendants on all remaining counts. Plaintiff's motion to compel turnover of funds, which is not disposed of herein, will be addressed by this court separately.

### ORDER

This case having been tried to the bench on May 24, 1993; and

For the reasons stated in the court's opinion of this date;

IT IS on this 20th day of October, 1993 hereby

ORDERED that judgment be entered for DEFENDANTS on all remaining counts.[1]

---

1. Plaintiff's pending motion to compel turnover of funds is not affected by this order.