**CHARLEY'S TAXI RADIO DISPATCH CORPORATION, a Hawaii Corporation, Plaintiff-Appellant,**

v.

**SIDA OF HAWAII, INC., a Hawaii Corporation; State of Hawaii; Department of Transportation; and Wayne J. Yamasaki,\* in his capacity as Director of Transportation, Defendants-Appellees.**

No. 85–1828.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 25, 1986.

Decided Feb. 12, 1987.

---

\* Wayne J. Yamasaki has been substituted for Dr. Ryokichi Higashionna pursuant to Fed.R.App.P. 43(c)(1).

Joel Linzer and Daniel J. Furniss, San Francisco, Cal., for plaintiff-appellant.

Gerald Y.Y. Chang, Honolulu, Hawaii, for State of Hawaii and Dep't of Transportation.

Torkildson, Katz, Jossem & Loden, Robert S. Katz, Honolulu, Hawaii, for SIDA.

Before FERGUSON, CANBY and HALL, Circuit Judges.

CANBY, Circuit Judge:

Charley's Taxi Radio Dispatch Corporation ("Charley's") appeals the district court's dismissal of its antitrust action. The defendants in this action are the State Independent Drivers Association of Hawaii, Inc. ("SIDA"), the State of Hawaii, the State of Hawaii's Department of Transportation ("DOT"), and Wayne J. Yamasaki, Director of Transportation. After a six-day bench trial, the district court found that Charley's had failed to establish that either SIDA or the state defendants had violated either section 1 or 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982). We hold that (1) the Eleventh Amendment bars Charley's action against Hawaii and the DOT; (2) under the *Parker* state action doctrine Director Yamasaki may not be enjoined from enforcing the challenged contract; and (3) SIDA did not engage in a group boycott in violation of the section 1 of the Sherman Act, or engage in other conduct prohibited by the Sherman Act. Accordingly, we vacate in part, affirm in part, and remand.

## FACTS

SIDA, the State Independent Drivers Association, Inc., is the largest taxi company on Oahu, Hawaii. It was formed in 1963 by a group of individual taxi owner-operators for the purpose of gaining access to airport and hotel taxi stands that were contracted out on an exclusive basis to individual taxi companies. SIDA's membership is limited to independent taxi operators; it does not admit fleet operators.

In 1963, Hawaii's Department of Transportation awarded a contract granting SIDA the exclusive right, subject to minor exceptions, to provide taxi service from Honolulu International Airport. No restrictions were placed on taxi service to the Airport. The DOT's decision to award an exclusive contract was unilateral and not based upon negotiations with SIDA.

From 1963 to 1971, SIDA's contract with the DOT was renewed every two years. In 1973 SIDA's contract was renewed for five years. In 1978, SIDA's contract was renewed for 15 years.

Charley's Taxi Radio Dispatch Corporation is the largest fleet operator on Oahu, Hawaii. In 1979, Charley's brought this action in the United States District Court for the District of Hawaii against SIDA, the State of Hawaii, and various state agencies and officials[1] alleging that (1) the exclusive contract between SIDA and the DOT restrained trade in violation of section 1 of the Sherman Act; (2) SIDA unlawfully monopolized in violation of section 2 of the Sherman Act; and (3) SIDA's refusal to accept it as a member was a *per se* unlawful group boycott in violation of section 1 of the Sherman Act.

On June 22, 1982, Charley's moved for partial summary judgment, arguing that *Parker* state action immunity was not available to the state defendants. The state defendants filed a countermotion as-

---

1. Charley's originally named as defendants Hawaii's Department of Transportation and Department of Land and Natural Resources, Dr. Higashionna, and the members of the Board of Land and Natural Resources. On March 25, 1983, the parties stipulated to the dismissal of the Department of Land and Natural Resources, the members of its Board, and Dr. Higashionna. Dr. Higashionna was later reinstated as a defendant.

serting that it was available. On April 1, 1983, the district court ruled that *Parker* immunity was unavailable under the *Midcal* two-prong test. *Charley's Radio Dispatch, Inc. v. SIDA*, 562 F.Supp. 712 (D.Hawaii 1983). On September 13, 1983, the district court denied the state defendants' motion to dismiss based on the Eleventh Amendment.

On November 5, 1984, following a bench trial, the district court ruled in favor of SIDA and Hawaii. It found that neither defendant had violated the Sherman Act. Judgment was entered on February 22, 1985. Charley's filed a timely appeal.

## DISCUSSION

### I. JURISDICTION AND THE ELEVENTH AMENDMENT

■ The first issue we must consider is whether the district court correctly asserted jurisdiction over the state defendants. We review de novo findings of subject matter jurisdiction. *Bright v. Bechtel Petroleum, Inc.*, 780 F.2d 766, 768 (9th Cir.1986). We conclude that the Eleventh Amendment deprived the district court of jurisdiction over Charley's action against Hawaii and the DOT.

■ The Eleventh Amendment provides that:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Under this amendment, an unconsenting state is immune[2] from suits brought in a federal court by citizens of another state or, as in this case, citizens of her own. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). The Eleventh Amendment's jurisdictional bar also extends to suits brought in federal court against state agencies and departments. *Id.; Almond Hill School v. United States Department of Agriculture*, 768 F.2d 1030, 1034 (9th Cir.1985).

■ Charley's contends that Hawaii and the DOT waived their immunity to suit in the district court. A state may waive its Eleventh Amendment immunity only by giving an "unequivocal indication" that it consents to suit in a federal court. *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 3145 n. 1, 87 L.Ed.2d 171 (1985). We may find such an indication where (1) the state expressly consents to federal jurisdiction in the context of the litigation, *see Actmedia, Inc., v. Stroh*, 789 F.2d 766, 772 (9th Cir.1986); (2) a state statute or constitutional provision expressly provides for suit in a federal court, *Atascadero*, 105 S.Ct. 3142 at n. 1; or (3) Congress clearly intends to condition the state's participation in a program or activity on the state's waiver of its immunity. *Id.* at 3150; *Doe v. Maher*, 793 F.2d 1470, 1477 (9th Cir.1986).[3]

■ None of these conditions are present here. Hawaii and the DOT have asserted their constitutional immunity throughout the course of this action. The statutes relied on by Charley's, Haw.Rev.

---

**2.** The Eleventh Amendment may be described as either creating an immunity for states or establishing a jurisdictional limitation on federal courts. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984) (employing both descriptions). Like a traditional immunity and unlike a jurisdictional bar, the protection afforded by the Eleventh Amendment may be waived. *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985). Like a jurisdictional bar and unlike a traditional immunity, however, the effect of the Eleventh Amendment must be considered *sua sponte* by federal courts. *See Demery v.*

*Kupperman*, 735 F.2d 1139, 1149 n. 8. (9th Cir. 1984), *cert. denied*, 469 U.S. 1127, 105 S.Ct. 810, 83 L.Ed.2d 803 (1985). Because the operation of the Eleventh Amendment has aspects of both an immunity and a jurisdictional bar, we apply the terms interchangeably.

**3.** Even in the absence of waiver or consent, a state may be sued in federal court when Congress, acting pursuant to § 5 of the Fourteenth Amendment, has so provided. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976).

Stat. §§ 662–2 and 662–3 (1976 & Supp. 1984), are waivers of immunity from tort liability.[4] They cannot even remotely be considered an "unequivocal indication" of consent to suit in federal court on antitrust claims.

■ Nor has Congress manifested a clear intent to condition either Hawaii's operation of the Airport or the DOT's entering into exclusive contracts on a waiver of Eleventh Amendment immunity. To the contrary, "in enacting the Sherman Act, [Congress] did not intend to compromise the States' ability to regulate their domestic commerce." *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 1726, 85 L.Ed.2d 36 (1985); *see also Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943) ("The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state"). The Eleventh Amendment thus barred Charley's action against Hawaii and the DOT.

■ In contrast with states and their agencies, state officials acting in their official capacity enjoy only limited immunity under the Eleventh Amendment. Although suits against state officials allegedly violating federal law may be brought in federal court, *see Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ex parte Young,* 209 U.S. 123, 160, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908), only prospective injunctive relief may be awarded, *Pennhurst,* 465 U.S. at 102–03, 104 S.Ct. at 909; *Edelman,* 415 U.S. at 666–67, 94 S.Ct. at 1357. Charley's alleged that the Airport's exclusive taxi service contract violated the Sherman Act. The district court thus properly entertained Charley's action to enjoin Director of Transportation Yamasaki from enforcing the contract.

The district court's jurisdiction over Charley's action against SIDA was, of course, unaffected by the Eleventh Amendment.

## II. *DIRECTOR YAMASAKI AND THE PARKER STATE–ACTION DOCTRINE*

■ Charley's contends that the district court erred in dismissing its injunctive action against Director of Transportation Yakasaki. We may affirm the district court on any ground supported by the record, even if the ground is not relied on by the district court. *Big Spring v. Bureau of Indian Affairs,* 767 F.2d 614, 616 (9th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2914, 91 L.Ed.2d 543 (1986). In this case we affirm on a ground in fact rejected by the district court: the *Parker* state-action doctrine.

■ In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court held that an anticompetitive marketing program instituted under the California Agricultural Act was exempt from the Sherman Act. The Court stated, "There is no suggestion of a purpose to restrain state action in the [Sherman] Act's legislative history." *Id.* at 351, 63 S.Ct. at 313. Over the years, the scope of the exemption for "state action" under *Parker* has been tested and delineated. *See, e.g., Southern Motor Carriers Rate Conference,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985) (state authorized rate bureaus composed of private common carriers found immune); *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 52–54, 102 S.Ct. 835, 841–42, 70 L.Ed.2d 810 (1982) (cities exempt when acting pursuant to clearly articulated and affirmatively expressed state policy); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 778–92, 95 S.Ct. 2004, 2008–15, 44 L.Ed.2d 572 (1975) (state bar acting alone could not immunize anticompetitive conduct).

In *Deak-Perera Hawaii, Inc. v. Department of Transporation,* 745 F.2d 1281 (9th

---

**4.** Hawaii Rev.Stat. § 662–2 provides: "The state hereby waives its immunity for liability for the torts of its employees...." Section 662–3 provides: "The circuit courts of the State and ... the state district courts shall have original jurisdiction of all tort actions on claims against the State...."

Cir.1984), *cert. denied,* 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 820 (1985), we applied the *Parker* doctrine in a factual setting nearly identical with the one before us. A business that had lost its exclusive contract to provide services at the Honolulu Airport brought an action against the DOT and its officials alleging violations of the Sherman Act. In *Deak-Perera,* the exclusive contract was a lease for the operation of a currency exchange concession at the Airport. Regarding the availability of *Parker* immunity, we stated:

> [The Department of Transportation's] grant of the lease was an action of the State of Hawaii 'acting as sovereign' and thus entitled to immunity from the antitrust laws....
>
> ... [T]he rationale of *Parker* rests on 'principles of federalism and state sovereignty.' These principles entitle the executive branch of the State of Hawaii to state action immunity. The Hawaii Constitution creates the executive as a co-equal branch of the state government and provides for the establishment of departments [such as] the Department of Transportation.... In granting ... the challenged lease, the Department of Transportation ... was fulfilling its constitutional duty to execute Haw.Rev.Stat. § 261-4, which permits the Department of Transportation to establish and operate airports....
>
> *We see no reason why a state executive branch, when operating within its constitutional and statutory authority, should be deemed any less sovereign than a state legislature, or less entitled to deference under principles of federalism.*

*Id.* at 1282–1283 (quoting *Hoover v. Ronwin,* 466 U.S. 558, 104 S.Ct. 1989, 1995, 80 L.Ed.2d 590 (1984) (emphasis added)).

*Deak-Perera* controls the *Parker* question before us. When it entered into an exclusive franchise contract with SIDA, the DOT was "operating within its constitution-al and statutory authority." The Hawaii legislature, as authorized by Hawaii Const. Art. V, § 6, created the DOT to "establish, maintain, and operate transportation facilities of the state, including ... airports." Hawaii Rev.Stat. §§ 26–19. Under the Aeronautics Act of 1947, Hawaii Stat. Ch. 261, the DOT is broadly authorized to "enter into contracts, leases, licences, and other arrangements ... [c]onferring the privilege of supplying goods, commodities, things, services or facilities at the airport." *Id.* at § 267–7(a) (Supp.1984). The DOT "may establish the terms and conditions of the contract, lease, license, or other arrangement, and may fix the charges, rentals, or fees." *Id.* Finally, Section 261–10, "Exclusive rights prohibited," cautions that "[t]his section shall not prevent the making of contracts, leases or other arrangements pursuant to § 261–7." The constitutional and statutory authority to enter into the challenged contract with SIDA is thus well established.

We noted in *Deak-Perera* that the legislature "contemplated an exclusive lease [to the currency exchange concession]." 745 F.2d at 1282. We do not view this statement, however, as establishing an additional requirement of legislative contemplation for a state executive agency or state official seeking *Parker* immunity.[5] Evidence that the legislature contemplated the alleged anticompetitive activities is an element of *Parker* immunity for cities, *see Golden State Transit Corp. v. Los Angeles,* 726 F.2d 1430, 1433 (9th Cir.1984), *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1865, 85 L.Ed.2d 159 (1985), and for private parties seeking *Parker* immunity when they have acted as representatives of a state government, *see Hoover v. Ronwin,* 466 U.S. 558, 104 S.Ct. 1989, 1995, 80 L.Ed.2d 590 (1984). In contrast, the Supreme Court required no such evidence of legislative contemplation when it ruled that a state supreme court was entitled to *Parker* immunity for its

---

5. The Supreme Court has not decided the question whether the executive branch "stands in the same position as the state legislature and [state] supreme court for the purposes of the [*Parker* ] state action doctrine." *Hoover v. Ronwin,* 466 U.S. 558, 104 S.Ct. 1989, 1995 n. 17, 80 L.Ed.2d 590 (1984).

actions in adopting and enforcing disciplinary rules to govern the state bar. *Bates v. State Bar of Arizona*, 433 U.S. 350, 359–60, 97 S.Ct. 2691, 2696–97, 53 L.Ed.2d 810 (1977); *see also Hoover v. Ronwin*, 104 S.Ct. at 1995–96 (discussing *Bates*).

 We conclude that state executives and executive agencies, like the state supreme court, are entitled to *Parker* immunity for actions taken pursuant to their constitutional or statutory authority, regardless of whether these particular actions or their anticompetitive effects were contemplated by the legislature. The requirement of specific authorization that we impose on cities to qualify for *Parker* immunity is not appropriate for the executive branch of the state government. When the state executive or executive agencies act within their lawful authority, their acts are those of the sovereign.[6]

Because the DOT was acting pursuant to its constitutional and statutory authority, the DOT did not violate the Sherman Act by entering into the exclusive franchise contract with SIDA. Director of Transportation Yamasaki therefore could not be enjoined from enforcing that contract.

### III. CHARLEY'S CLAIMS AGAINST SIDA

The district court found that Charley's antitrust claims against SIDA were without merit. On appeal, Charley's challenges this finding on three grounds: (1) SIDA's refusal to admit Charley's to membership is a *per se* violation of section 1 of the Sherman Act; (2) SIDA's exclusive right to provide taxi service at the Airport is prohibited by section 2 of the Sherman Act; and (3) SIDA's exclusive contract is a restraint of trade in violation of section 1 of the Sherman Act. We reject Charley's challenge.

#### A. Refusal to Grant Membership

Charley's contends that by refusing to admit Charley's to membership, SIDA engaged in a group boycott in violation of section 1 of the Sherman Act.

 Section 1 of the Sherman Act prohibits "Every contract, combination ... or conspiracy, in restraint of trade." 15 U.S.C. § 1. Because every contract falls within the literal terms of this prohibition, section 1 has been prudently construed to prohibit only restraints of trade that are unreasonable. *See Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). On the basis of their proven anticompetitive effect, group boycotts are considered unreasonable *per se*. *See Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Consequently, once properly identified, group boycotts may be judged unlawful without further inquiry. Yet as we have observed, "The term 'group boycott' can be applied to divergent types of concerted activity, not all of which necessarily have a pernicious effect on competition or lack any redeeming virtue." *Ron Tonkin Gran Turismo Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1383 (9th Cir.), *cert. denied*, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981).

Charley's argues that by excluding it from SIDA, the members of SIDA have engaged in a group boycott that prevented it from competing in the ground-transportation market outbound from the Airport ("Airport-outbound market").[7] Initially we

---

**6.** By analogy, cities are treated differently from branches of the state governments for purposes of the eleventh amendment, one of the Constitution's most concrete expressions of federalism. Cities are entitled to no eleventh amendment protections, *see Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979), but state agencies and departments are protected in some circumstances from suit in federal court by the eleventh amendment's bar against "one of the United States." *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984).

**7.** In order to have a group boycott, there must be more than one boycotter. For this reason, Charley's must frame its argument in terms of a violation by the *members* of SIDA. We assume for purposes of decision that this change of focus is legitimate. A corporate shell cannot

note that members of SIDA did not engage in a group boycott of the classic type. The type of group boycott that has classically been held unlawful *per se* is one in which either (1) two or more firms agree not to deal with a competing firm in an industry that requires horizontal dealing, *see, e.g. Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (exchange brokers agree not to trade with nonexchange brokers), or (2) two or more firms agree not to deal with a firm with which they are in a vertical relationship in an industry that requires vertical dealing, *see, e.g., Klor's* (national household appliance distributors refuse to sell to department store); *Fashion Originators' Guild of America v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (textile retailers agree not to sell to wholesalers who continue to deal with "style-pirates"). The taxi industry is not an industry that requires dealing among horizontal competitors, nor are the members of SIDA in a vertical relationship with Charley's.

In order to bring its allegations within the ambit of the *per se* rule, Charley's relies on *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) and *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) ("*Northwest Wholesale*"). In both of these cases, defendant firms had acted in concert to acquire a product sought by the plaintiff competitor firm and refused to make that product available to the competitor. In the former

case, the defendant firms had joined to produce "AP news" and agreed to by-laws restricting access to this news. In the latter case, defendant firms had formed a buying cooperative that sold stationery supplies to its members at discount rates and then expelled the plaintiff from the cooperative for failure to abide by its disclosure rules. These cases, however, fail to support Charley's claim of *per se* violation.

In *Associated Press*, the Supreme Court summarized its holding as follows: "We merely hold that arrangements or combinations *designed to stifle competition* cannot be immunized by adopting a membership device accomplishing that purpose." 326 U.S. at 19, 65 S.Ct. at 1424. (emphasis added). The Court thus identified anti-competitive purpose or effect as a central characteristic of a group boycott. *Accord White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963) (group boycotts unlawful *per se* because they are "naked restraints of trade with no purpose except stifling competition"); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76–78 (9th Cir.1969) (anticompetitive intent required), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *see also Northwest Wholesale*, 105 S.Ct. at 2620 (no *per se* violation because, "[t]he act of expulsion does not necessarily imply anticompetitive animus ... [where] purchasing cooperatives must establish and enforce reasonable rules").[8]

---

shield a horizontal restraint among the members of the corporation or association. *See, e.g., United States v. Topco Assocs.*, 405 U.S. 596, 608–12, 92 S.Ct. 1126, 1133–35, 31 L.Ed.2d 515 (1972).

**8.** The cases cited by Charley's do not support its contention that motive or intent is immaterial in group boycott cases. In *Fashion Originators' Guild*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949, the Supreme Court held a group boycott intended to supress style pirates could not avoid *per se* condemnation on the ground that style piracy was an industry evil which should be suppressed. *Id.* at 467–68, 61 S.Ct. at 707–08. In *United States v. Hilton Hotels Corp.*, 467 F.2d 1000 (9th Cir.1972), *cert. denied*, 409 U.S. 1125,

93 S.Ct. 938, 35 L.Ed.2d 256 (1973), we held that a group of hotels could not justify the economic coercion of their suppliers on the ground that it would help finance their effort to attract conventions. *Id.* at 1002–03.

These cases stand for the proposition that intentional anticompetitive behavior—supressing rivals or coercing suppliers—cannot be justified on the basis of a benign ultimate objective—eliminating industry pirating or furthering economic growth. *See Hilton Hotels* ("Defendants 'intended' to impose these restraints upon competition in the only relevant sense here. The ultimate objective defendants sought to achieve is immaterial,") (citations omitted). Thus, while ultimate objective is immaterial, anticompetitive intent is the touchstone of the inquiry.

In *Northwest Wholesale*, the Court also looked to the anticompetitive effect of the allegedly unlawful expulsion to gauge the appropriateness of *per se* treatment. *Id.* at 2620–21. The Court stated,

Unless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always certain to have an anticompetitive effect is not warranted.

*Id.* at 2621. Finding no evidence of such "structural characteristics," the Court concluded that challenged conduct was not *per se* unreasonable. *Id.*

 We find the characteristics of a *per se* unlawful boycott identified in the above cases to be lacking in the activities of the members of SIDA. The district court found that "SIDA was organized to gain access to a major market for independents, and not to deny it to Charley's or any other taxi fleet." Charley's does not challenge the district court's finding. Although SIDA does not permit fleet owners to become members, its membership remains open to additional independent owner-operators. SIDA does not prevent its members from competing with each other.

SIDA does not possess "market power or exclusive access to an element essential to effective competition." *Id.* Although SIDA currently has an exclusive franchise to provide service to the Airport-outbound market, this fact is no more probative of market power than the fact that the cooperative in *Northwest Wholesalers* had exclusive access to discount goods. In each case there are other markets that a would-be competitor may take advantage of. The Airport-outbound market, though important, is not essential to effective competition. The district court found, and Charley's does not contest, that competition among taxis on Oahu is alive and well. Even within the Airport-outbound market, SIDA members compete with each other.

In light of the purpose and effect of SIDA's membership policies, and the limits of its market power, we conclude that SIDA's exclusion of Charley's from membership does not constitute a *per se* unlawful group boycott.[9]

### B. *Monopolization*

 Charley's contends that SIDA monopolized in violation of section 2 of the Sherman Act. Charley's argues that SIDA's monopoly over the Airport market arose from SIDA's exclusive franchise contract with Hawaii.

Charley's section 2 claim is simply another attempt by Charley's to attack the validity of the SIDA contract. We earlier determined that the DOT had *Parker* immunity to grant SIDA an exclusive franchise to provide outbound taxi service from the Airport. *Parker* immunity exempts state action, not merely state actors. Because the monopoly granted to SIDA was shielded by the *Parker* doctrine, SIDA cannot be held liable for possessing that monopoly. To hold otherwise, would allow the *Parker* doctrine to be circumvented by artful pleading: "A plaintiff could frustrate any [*Parker* protected state plan] merely by filing suit against the regulated private parties, rather than the state officials who implement the plan." *Southern Motor Carriers Rate Conference*, 105 S.Ct. at 1727. Charley's section 2 claim is meritless.

### C. *The Exclusive Contract as a Restraint of Trade*

 Finally, Charley's contends that the contract granting SIDA the exclusive right to pick up passengers at the Airport is a restraint of trade prohibited by section 1 of the Sherman Act. Our analysis of Charley's monopolization claim applies with equal force here. Our earlier conclusion that the DOT had *Parker* immunity to grant SIDA the exclusive contract estab-

---

**9.** Charley's offers no argument that SIDA's exclusion of Charley's from membership fails a "rule of reason" test.

lishes that the contract does not violate section 1 of the Sherman act.

## CONCLUSION

We AFFIRM the district court's dismissal of Charley's Sherman Act claims against SIDA and Director Yamasaki. The district court erred in asserting jurisdiction over Hawaii and the DOT. We VACATE the district court's dismissal of Charley's claims against Hawaii and the DOT and REMAND the case so the district court may dismiss these claims for lack of jurisdiction. Costs are to be awarded to appellees.

AFFIRMED in part; VACATED in part; and REMANDED.