

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-10-1995

# Lesal v Echotree

Precedential or Non-Precedential:

Docket 93-5707

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Lesal v Echotree" (1995). *1995 Decisions*. Paper 40.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/40

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 93-5707
_____

LESAL INTERIORS, INC.
Appellant

v.

ECHOTREE ASSOCIATES, L.P., a New Jersey
Limited Partnership; HLM/ECHOTREE, INC.;
ECHELON GLEN COOPERATIVE, INC.;
H. L. MICHAELS, INC.; M. J. RAYES INCORPORATED,
a/k/a M. J. RAYNES, INC.; RESOLUTION TRUST CORPORATION,
Receiver of CorEast Savings Bank F.S.B., whose address
is 808 Moorefield Park Drive, Richmond, Virginia, 23236;
FEDERAL DEPOSIT INSURANCE COMMISSION, as Receiver for
American Savings Bank, F.S.B.; GENERAL ELECTRIC CAPITAL
CORPORATION; DLG FINANCIAL SERVICES CORPORATION, a/k/a
DLG FINANCIAL SERVICES, INC.; COLONIAL EQUITY OF
NEW YORK, INC.; JAMES D. DEMETRAKIS; VINCENT TRAVALINO;
DEL MASTRO'S, INC., t/a DEL'S ENTERPRISE; DEL MASTRO
ENTERPRISES, INC.; HORIZON I CORPORATION; COLONIAL DPC CORP.,
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil 91-02595)
_____

No. 94-5047
_____

LESAL INTERIORS, INC.
Appellant

v.

ECHOTREE ASSOCIATES, L.P., a New Jersey
Limited Partnership; HLM/ECHOTREE, INC.;
ECHELON GLEN COOPERATIVE, INC.;
H. L. MICHAELS, INC.; M. J. RAYES INCORPORATED,
a/k/a M. J. RAYNES, INC.; RESOLUTION TRUST CORPORATION,
Receiver of CorEast Savings Bank F.S.B., whose address
is 808 Moorefield Park Drive, Richmond, Virginia, 23236;
FEDERAL DEPOSIT INSURANCE COMMISSION, as Receiver for
American Savings Bank, F.S.B.; GENERAL ELECTRIC CAPITAL

CORPORATION; DLG FINANCIAL SERVICES CORPORATION, a/k/a
DLG FINANCIAL SERVICES, INC.; COLONIAL EQUITY OF
NEW YORK, INC.; JAMES D. DEMETRAKIS; VINCENT TRAVALINO;
DEL MASTRO'S, INC., t/a DEL'S ENTERPRISE; DEL MASTRO
ENTERPRISES, INC.; HORIZON I CORPORATION; COLONIAL DPC CORP.,I

(Camden New Jersey District Civil No. 91-02595)

LESAL INTERIORS, INC.

v.

RESOLUTION TRUST CORPORATION, as Receiver for
COREAST SAVINGS BANK; COLONIAL DPC CORP. I, a
New Jersey Corporation; THE ECHELON GLEN RESIDENTS
AND OWNERS ASSOCIATION; THE POLIS HOUSING FOUNDATION
CORPORATION VI, and certain John Doe defendants,
financing institutions involved in the "refinancing"
of the Echelon Glen Project, and Certain John Doe II
defendants, transferees of assets fraudulently
conveyed by Colonial DPC Corp. I;
HOWARD L. MICHAELS

(Camden New Jersey District Civil No. 93-05152)

Lesal Interiors, Inc.,
Appellant

———————————————

Argued:  July 26, 1994
Before:  BECKER and ALITO, Circuit Judges
and BRODY, District Judge*

(Opinion Filed: February 10, 1995)

———————————————

*The Honorable Anita B. Brody, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

H. THOMAS HUNT, ESQ. (Argued)
Hunt & Scaramella, P.C.
220 Lake Drive East – Suite 105
Cherry Hill, New Jersey 08002

<u>Attorneys for Appellant</u>

ANN F. KIERNAN, ESQ. (Argued)
Jamieson, Moore, Peskin & Spicer
300 Alexander Park
CN-5276
Princeton, New Jersey 08543-5276

<u>Attorneys for Appellees</u>
Resolution Trust Corporation
as Receiver for CorEast Savings Bank
and Colonial DPC Corp. I

---

OPINION OF THE COURT

---

ALITO, <u>Circuit Judge</u>:

Lesal Interiors, Inc. ("Lesal") has appealed a district court order entering judgment against it on claims that it originally asserted against Colonial DPC Corporation I ("Colonial") and CorEast Savings Bank ("CorEast"). Colonial was formerly the wholly owned nonbanking subsidiary of CorEast, which is now under the receivership of the Resolution Trust Corporation ("RTC"). The district court held that Lesal could not recover from Colonial on these claims due to the federal common law <u>D'Oench Duhme</u> doctrine[1] and its statutory counterpart, 12 U.S.C.

---

[1]. <u>See</u> <u>D'Oench Duhme & Co. v. FDIC</u>, 315 U.S. 447 (1942).

§ 1823(e).  In addition, the court held that the failure of Lesal's claims against Colonial doomed its attempt to recover from CorEast based on the theory that Colonial was CorEast's alter ego.  On appeal, the RTC defends the district court's decision based on 12 U.S.C. § 1823(e) and does not contend that the federal common law D'Oench Duhme doctrine provides broader protection.  Looking to the plain language of 12 U.S.C. § 1823(e), we hold that this provision does not apply to claims against a depository institution's subsidiary, and we therefore reverse the order entering judgment against Lesal.

Lesal has also appealed a subsequent district court order denying its motion for garnishment under N.J.S.A. 2A:17-63 of a debt allegedly owed by Colonial to Lesal's judgment debtor.  Because Colonial disputed this debt, we agree with the district court that the summary procedure provided by N.J.S.A. 2A:17-63 was inapplicable here, and we therefore affirm this order of the district court.

I.

In 1987, Echotree Associates, L.P. ("Echotree), a New Jersey limited partnership, acquired in fee simple an apartment complex in Voorhees, New Jersey, known as the Echelon Glen Apartments.  Echotree undertook to renovate the apartments and to convert them into cooperatives, and CorEast, a federally

chartered savings bank, provided secured financing for this project.

In December 1988, in order to carry out the renovation, Echotree entered into a contract with Lesal Interiors, Inc., which specializes in projects of this type. Under this contract, Echotree was obligated to pay Lesal $1,536,000. In addition, Lesal performed further work under change orders for a price of $390,000. Echotree failed to pay Lesal for $778,000 of the amount that it owed.

In February 1989, Echotree conveyed its fee simple interest to Echelon Glen Cooperative, Inc., a New Jersey nonprofit corporation. After this conveyance, Echotree held shares in Echelon Glen Cooperative, Inc., as well as proprietary leases for many of the cooperative units.

In 1990, the conversion project failed. As part of the workout of the loan relationship between Echotree and CorEast, CorEast formed a wholly owned subsidiary, Colonial DPC Corporation I, a Virginia corporation.[2] CorEast and Colonial then entered into a settlement agreement with Echotree and its managing general partner. Under this agreement, Echotree

---

[2]. The district court found that Colonial used CorEast's offices; that "[m]ost or all of Colonial's officers and directors were also full-time CorEast employees and/or agents"; that "Colonial conducted separate board minutes, but prior to January, 1991, apparently maintained no corporate minutes"; and that Colonial, while a CorEast subsidiary "had no income or employees, paid no rent, incurred no office expenses, and paid no taxes." Lesal Interiors, Inc. v. Resolution Trust Corporation, 834 F.Supp. 721, 727 (D.N.J. 1993).

conveyed to Colonial both shares in Echelon Glen Cooperative, Inc. and its proprietary leases, and CorEast released certain debts and extended new loans. The "Recital" to the settlement agreement stated that "[Colonial] shall agree to . . . pay on behalf of Echotree, or indemnify Echotree against, certain expenses incurred by Echotree with respect to the [p]roperty." App. 296. Paragraph 6 of the agreement obligated Colonial to "pay on behalf of Echotree, its partners and principals . . . Construction Payables, in an amount not to exceed $1,180,000 dollars . . . ." Paragraph 6 also appointed Colonial as Echotree's "attorney-in-fact . . . to negotiate, litigate or settle . . . with each of the specifically identified creditors shown in Schedule[] C . . . as [Colonial] wishes, in its sole discretion." Id. at 311-12. Schedule C listed construction payables totalling $1,180,000. Id. at 332. The first item on this list was: "Lesal Interiors – Amount Completed $690,000 – Total $690,000." Paragraph 28 of the agreement stated:

> This Agreement and the other Documents are
> solely for the benefit of the parties hereto,
> and may not be relied by [sic] any other
> persons or entities including, without
> limitation, any present or future creditors
> of [Colonial], Echotree, or Michaels
> [Echotree's managing general partner].

Id. at 330. Lesal did not participate in and was not aware of the negotiations leading to the settlement agreement.

In July 1990, Lesal brought suit in New Jersey Superior Court against Echotree, Echotree's general partner, Echelon Glen

Cooperative, Inc., CorEast, Colonial, and other parties. Lesal sought recovery from Echelon Glen Cooperative, Inc., Echotree, and Echotree's general partner. As against CorEast and Colonial, Lesal sought only to establish the priority of its alleged mechanic's lien.

In early 1991, the Office of Thrift Supervision declared CorEast insolvent and appointed the RTC as CorEast's receiver. In April 1991, the New Jersey Superior Court substituted the RTC in the action in place of CorEast, and in May the RTC removed the case to the United States District Court for the District of Columbia. That court, in turn, transferred the case to the United States District Court for the District of New Jersey.

In May 1992, Lesal, with leave of court, filed an amended complaint containing new counts that sought to recover from CorEast and Colonial for the $778,000 due from Echotree. Among these new counts were count VIII, which sought recovery from Colonial on the ground that Lesal was a third-party beneficiary of the settlement agreement, and count IX, which sought to recover from CorEast on the theory that Colonial was CorEast's alter ego and that CorEast was therefore liable to Lesal for Colonial's debts, obligations and liabilities. In addition, count XI sought recovery from CorEast, Colonial, and other defendants based on fraud.

In August 1992, all of CorEast's shares in Colonial were acquired by Polis Housing Foundation Corporation VI, a New Jersey nonprofit corporation. Colonial was converted into a New Jersey nonprofit corporation.

In November 1992, the district court entered a default judgment in favor of Lesal and against Echotree and its general partner, jointly and severally, in the amount of $778,000, plus costs and interest. In March 1993, the court entered an order granting CorEast's and Colonial's motion for summary judgment with respect to most of the new counts contained in the amended complaint, but the court denied summary judgment with respect to counts VIII (third-party beneficiary), IX (alter ego), and XI (fraud).

In May 1993, the district court held a bench trial on these latter counts and subsequently found for CorEast and Colonial on all of them based on the D'Oench Duhme doctrine and its statutory counterpart, 12 U.S.C. § 1823(e). See Lesal Interiors, Inc. v. RTC, 834 F.Supp. 721 (D.N.J. 1993). After observing that Colonial was entitled to D'Oench Duhme protection because it was a wholly owned subsidiary of CorEast (834 F.Supp. at 730-31), the court applied the requirements of section 1823(e) to each of Lesal's outstanding claims (Id. at 731-33).

Turning to Lesal's third-party beneficiary claim against Colonial, the court first held that Lesal could not recover under the settlement agreement because that agreement did

not satisfy section 1823(e)(1), which requires that a covered agreement be "in writing." Id. at 731–32. The court concluded that this provision demanded explicit documentation evidencing Colonial's obligation to make payments to Lesal. Id. Observing that the settlement agreement was "ambiguous both as to whether Lesal was an intended third-party beneficiary and as to whether Colonial specifically agreed to pay the $690,000 owed to Lesal," the court held that the agreement was "an insufficient writing for purposes of section 1823(e)." Id. at 732. The court also held that Lesal's third-party beneficiary claim foundered on section 1823(e)(2), which requires that a covered agreement be "executed by . . . any person claiming an adverse interest thereunder." Because "Lesal did not participate in the execution of the Settlement Agreement," the court reasoned, this provision "preclude[d] it from enforcing the agreement against defendants." Id. Finally, the court considered whether Lesal's third-party beneficiary claim satisfied section 1823(e)(3), which requires that a covered agreement be approved by "the depository institution or its loan committee." Id. at 732–33. CorEast and Colonial argued that this requirement was not met because the settlement agreement was never approved by Colonial's board of directors, but Lesal contended that this provision was "inapplicable to transactions involving a bank's wholly-owned subsidiary rather than the bank itself." Id. at 732. The court expressed skepticism about Lesal's argument, stating:

> Inasmuch as section 1823(e) has been extended
> to transactions involving wholly-owned
> subsidiaries . . . , it is logical to
> conclude that "wholly-owned subsidiary"
> should be read into the statute -- in place
> of "depository institution" -- where the
> agreement in question was entered into by the
> subsidiary and not the depository
> institution.

Id. The court, however, "refrain[ed] from definitively holding that section 1823(e)(3) independently bar[red] Lesal's claim." Id. at 733.

Turning to Lesal's fraud claim, the court concluded that "[a]s this claim necessarily relies upon a non-written representation, it too falls within the scope of D'Oench and section 1823(e)." Id. Finally, with respect to count IX of the amended complaint, which sought to recover from CorEast on an alter ego theory, the court concluded that it was unnecessary "to determine whether CorEast would be derivatively liable on an alter ego theory" because "Colonial had not been found liable on any count." Id. Lesal filed a timely notice of appeal from the district court's order disposing of all of these claims.

The district court subsequently ruled on the motion under which Lesal, relying on N.J.S.A. 2A:17-63, had sought an order compelling Colonial to satisfy the default judgment that Lesal had obtained against Echotree. The court concluded that this statutory remedy was unavailable because Colonial had not admitted that it owed a debt to Echotree and because Echotree had

not obtained a judgment against Colonial.  Lesal then filed a second notice of appeal from this order.

                              II.

          A.  We first consider Lesal's contention that the district court erred in rejecting its third-party beneficiary and alter ego claims based on the D'Oench Duhme doctrine and 12 U.S.C. § 1823(e).[3]  The D'Oench Duhme doctrine originated with the Supreme Court's decision in D'Oench Duhme & Co. v. FDIC, 315 U.S. 447 (1942).  In that case, a securities firm, D'Oench Duhme & Co., sold bonds to a state bank.  After the bonds defaulted, D'Oench Duhme & Co. executed notes payable to the bank and made interest payments on them so that the bank could avoid showing the past due bonds on its books, but the parties entered into a side agreement that the notes would not be called for payment and that the interest payments would be repaid.  Without learning of the side agreement, the Federal Deposit Insurance Corporation ("FDIC") subsequently insured the bank and, as part of a purchase and assumption agreement, acquired a note executed by D'Oench Duhme & Co.'s as a renewal of the original notes.  Id. at 453-54.  The FDIC then sued to collect on the note, and the bank alleged in its answer that the note had been given without consideration and with the understanding that it would not be sued upon.  Id.

---

[3].  Lesal does not seek reversal of the district court order with respect to its fraud claim.  See Appellant's Br. at 19, 26.

at 456.  The Supreme Court held, however, that D'Oench Duhme &
Co. was liable as a matter of federal law based on "a federal
policy to protect [the FDIC] and the public funds which it
administers against misrepresentations as to the securities or
other assets in the portfolios of the banks which [it] insures or
to which it makes loans."  Id. at 457.  The Court's decision in
this case is often described as resting on federal common law.
See, e.g., Boyle v. United Technologies, 487 U.S. 500, 504
(1988); Illinois v. City of Milwaukee, 406 U.S. 91, 105 n.6
(1992).

In 1950, Congress effectively codified the holding of
D'Oench Duhme by enacting Section 13(e) of the Federal Deposit
Insurance Act, 12 U.S.C. § 1823(e), and in 1989, as part of the
Financial Institutions Reform, Recovery, and Enforcement Act
(FIRREA), 12 U.S.C. § 1441a(b)(4), Congress extended the
application of 12 U.S.C. § 1823(e) to the RTC.[4]  There is

---

[4].  12 U.S.C. § 1441a(b)(4) provides, with certain exceptions not
pertinent here, that:

> [T]he [RTC] shall have the same powers and rights to
> carry out its duties with respect to institutions
> described in paragraph (3)(A) as the Federal Deposit
> Insurance Corporation has under sections 11, 12 and 13
> of the Federal Deposit Insurance Act [12 U.S.C.A. §§
> 1821, 1822 and 1823] with respect to insured depository
> institutions (as defined in section 3 of the Federal
> Deposit Insurance Act) [12 U.S.C.A. § 1813].

Paragraph (3)(A) [12 U.S.C. § 1441a(b)(3)(A)] provides:

> The duties of the Corporation shall be to carry out a
> program under the general oversight of the Thrift
> Depositor Protection Oversight Board including:

authority for the proposition that the federal common law rule recognized in D'Oench is not coextensive with the terms of 12 U.S.C. § 1823(e). See, e.g., E.I. du Pont de Nemours & Co. v. FDIC, 32 F.3d 592, 596-97 (D.C. Cir. 1994); FSLIC v. Griffin, 935 F.2d 691, 698 (5th Cir. 1991), cert. denied, 112 S.Ct. 1163 (1992); Hall v. FDIC, 920 F.2d 334, 339 (6th Cir. 1990), cert. denied, 501 U.S. 1231 (1991). Here, however, the appellees have not argued that the federal common law doctrine provides broader protection for them than does section 1823(e),[5] and we therefore limit our consideration to that statutory provision.

(..continued)

> (A) To manage and resolve all cases involving depository institutions --
>
> (i) the accounts of which were insured by the Federal Savings and Loan Insurance Corporation before the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989; and
>
> (ii) for which a conservator or receiver is appointed after December 31, 1988, and before such date as is determined by the Chairperson of the Thrift Depositor Protection Oversight Board, but not earlier than January 1, 1995, and not later than July 1, 1995 (including any institution described in paragraph (6)).

[5]. See Appellee's Br. at 17-21. When asked at oral argument whether the federal common law doctrine and its statutory counterpart differed, appellee's counsel stated that the two were "very close." While she added that there were "some subtle differences," she did not, either at argument or in her written submissions, identify any such differences, much less any that

B.  Lesal argues that section 1823(e) does not protect

Colonial.[6]  Section 1823(e) states (emphasis added):

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement --
>
> (1) is in writing,
>
> (2) was <u>executed by the depository institution</u> and
>
> > any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was <u>approved by the board of directors of the depository institution or its loan committee,</u> which approval shall be <u>reflected in the minutes of said board or committee</u>, and
>
> (4) has been, continuously, from the time of its execution, <u>an official record of the depository institution</u>.

The term "insured depository institution" in section 1823(e) is

defined to mean a "bank or savings association" insured by the

FDIC.  12 U.S.C. § 1813(c)(2).  When 12 U.S.C. § 1823(e) is

(..continued)
would be helpful to her clients.  <u>See</u> <u>E.I. du Pont de Nemours & Co.</u>, 32 F.2d at 596-97 (common law doctrine is narrower than § 1823 in that non-fault may be asserted as a defense); <u>FDIC v. Meo</u>, 505 F.2d 790, 792-93 (9th Cir. 1974) (same).

[6].  Lesal also argues that Colonial and the RTC cannot invoke the <u>D'Oench Duhme</u> doctrine because the RTC accepted benefits under the settlement agreement.  In light of our holding regarding the applicability of 12 U.S.C. § 1823(e) to Colonial, we need not and do not reach this agreement.

applied to the RTC pursuant to 12 U.S.C. § 1441a(b)(4), the term "insured depository institution" must be understood to mean a depository institution whose accounts were formerly insured by the Federal Savings and Loan Insurance Corporation and for which a conservator or receiver was appointed during the period specified by statute.  See 12 U.S.C. §§ 1441a(b)(3)(A) and 1441a(b)(4).

The statutory language that we have highlighted above leaves little doubt that 12 U.S.C. § 1823(e) does not apply to a claim against a subsidiary of an "insured depository institution."  Under subsection (2), a claim based on a covered agreement is valid only if the agreement was "executed by the depository institution."  Under subsection (3), such an agreement must be "approved by the board of directors of the depository institution or its loan committee" and must be "reflected in the minutes of said board or committee."  And under subsection (4), the agreement must have been "continuously, from the time of its execution, an official record of the depository institution."  Few agreements between subsidiaries of depository institutions and third parties are likely to satisfy these requirements.  Such agreements will generally be executed by the subsidiaries' officers or directors and maintained as records of the subsidiaries.  Therefore, if the language of subsections (2), (3), and (4) is taken literally, it would appear to make most agreements of such subsidiaries, even if executed in the

generally accepted manner, unenforceable in the event that the subsidiaries' parent becomes insolvent.[7]  Furthermore, "[r]equiring bank boards . . . to consider, approve, and record every transaction entered into . . . by entities held by the bank as investments or subsidiaries . . . would make virtually impossible the performance by officers and directors of their upper level management and policymaking functions."  Alexandria Associates, Ltd. v. Mitchell Co., 2 F.3d 598, 603 (5th Cir. 1993).  It is most unlikely that Congress intended such a result.[8]

In order to give these provisions an arguably sensible meaning as applied to a subsidiary, they must be read to require that an agreement be executed by the subsidiary, that it be approved by the subsidiary's board of directors, and that it be

---

[7].  Literal compliance with subsection (3) may raise the likelihood that a depository institution could be classified as the alter ego of its subsidiary, thus exposing the institution to significant risk.  See, e.g., FDIC Rules, 12 C.F.R. §§ 337.4(a)(2), 362.2(d)(requiring, inter alia, that "bona fide subsidiaries" have an independent board of directors and conduct business pursuant to independent policies and procedures designed to inform customers that the subsidiary is a separate organization because such factors are among "the minimum necessary to assure the likelihood, in all circumstances, that the corporate separateness between a parent bank and its subsidiary will be respected."  58 Fed. Reg. 64462, 64469 (FDIC 1993)).

[8].  In addition, section 1823(e) governs the validity of a claim "against the Corporation," i.e., the FDIC or the RTC, and it is questionable whether a claim against a subsidiary of a depository institution taken over by the FDIC or RTC constitutes a claim against the FDIC or RTC as such.

maintained as an official record of the subsidiary.  This is the

approach advocated by the appellees,[9] but this approach requires

major statutory surgery.  It requires that the phrase "depository

institution" be excised from subsections (2), (3), and (4) and

that the phrase "wholly owned subsidiary" or some equivalent

language be put in its place.  We are most reluctant to treat the

language of section 1823(e) in such a fashion, particularly

because we have found no legislative history showing that

Congress specifically intended for section 1823(e) to apply to

claims against subsidiaries.[10]

We are aware that several other courts of appeals have

held that the common law D'Oench Duhme doctrine and its statutory

counterpart apply to claims against subsidiaries.  See Robinowitz

v. Gibraltar Savings, 23 F.3d 951, 956 (5th Cir. 1994), petition

for cert. filed, 63 U.S.L.W. 3326 (Sept. 26, 1994); Sweeney v.

---

[9]. The district court likewise suggested that, when § 1823(e) is
applied to a subsidiary, the phrase "`wholly-owned subsidiary'
should be read into the statute -- in place of `depository
institution.'"  834 F.Supp. at 732.

[10]. See Conf. Rep. No. 101-222, 101st Cong. 1st Sess. (1989),
reprinted in 1989 U.S.C.C.A.N. 432; H.R. Rep. No. 101-54(I),
101st Cong., 1st Sess. 357 (1989), reprinted in 1989 U.S.C.C.A.N.
86, 131-32, 153; Sen. Rep. No. 101-19, 101st Cong. 1st Sess.
(1989); Conf. Rep. No. 3049, 81st. Cong., 2d Sess. (1950),
reprinted in 1950 U.S.C.C.A.N. 3776-79; H.R. Rep. No. 2564, 81st
Cong., 2d Sess. (1950), reprinted in 1950 U.S.C.C.A.N. 3765,
3774; Sen. Rep. No. 1269, 81st Cong., 2d Sess. (1950).  See also
96 Cong. Rec. 10,731 (1950)("[U]nder section [1823(e)] . . .
certain conditions for the first time are imposed upon a bank in
the event agreements are entered into between customers of the
bank and the bank.").

RTC, 16 F.3d 1, 4 (1st Cir. 1994), cert. denied, 115 S.Ct. 291 (1994); Oliver v. RTC, 955 F.2d 583, 585-86 (8th Cir. 1992); Victor Hotel Corp. v. FCA Mortgage Corp., 928 F.2d 1077, 1083 (11th Cir. 1991). But none of those decisions relied exclusively on section 1823(e), as opposed to the common law D'Oench Duhme doctrine, and they are therefore distinguishable on that ground. Insofar as those decisions dealt with section 1823(e), however, we find them unpersuasive and decline to follow them. None of those decisions addressed the language of section 1823(e), and thus none of them confronted the difficulty of applying the language of that provision to claims against a subsidiary.

The appellees argue that the application of section 1823(e) to claims against subsidiaries would represent sound public policy. They approvingly quote the following statement of the Eleventh Circuit:

> [A] holding that D'Oench is inapplicable to [the subsidiary] in this case would seriously undermine FSLIC's policy consideration. The FSLIC has to rely on a financial institution's written records and its assets, such as wholly-owned subsidiaries, to determine solvency for regulatory purposes.

Appellees' Br. at 19, quoting Victor Hotel Corp. 928 F.2d at 1083 (brackets inserted in brief). But whatever the validity of this view, we cannot alter or ignore the plain meaning of section 1823(e). Furthermore, we lack the information and expertise needed to decide whether the extension of section 1823(e) to claims against subsidiaries would on balance be beneficial as a

matter of policy.  Accordingly, we hold that section 1823(e) does not apply to claims against a subsidiary such as Colonial, and the order of the district court entering judgment in favor of Colonial must therefore be reversed.

The question remains whether, in light of this holding, 12 U.S.C. § 1823(e) nevertheless requires the dismissal of Lesal's alter ego claim against CorEast.  The district court did not address this question; instead the district court reasoned that the alter ego claim failed because Lesal's claims against Colonial were barred by the D'Oench Duhme doctrine and 12 U.S.C. § 1823(e).  When a district court decision cannot be affirmed on the ground adopted by that court, we have the discretion to consider whether that decision can be affirmed on alternative grounds, but we need not do so.  Langer v. Monarch Life Insurance Co., 966 F.2d 786, 807-08 (3d Cir. 1992).  Here, because the parties have not briefed the specific question whether Lesal's alter ego claim is independently barred by 12 U.S.C. § 1823(e) or the common law D'Oench Duhme doctrine, we decline to consider if the entry of judgment for the RTC as receiver for CorEast can be affirmed on this ground.  The district court on remand can consider that question in the first instance.


III.

We thus turn to Lesal's argument that the district court erred in denying its motion for garnishment of Echotree's alleged right to indemnification for the default judgment obtained by Lesal.  We affirm the district court's denial of this motion.

Lesal's motion was predicated solely on N.J.S.A. 2A:17-63,[11] which provides a summary turnover procedure that may be used only when the garnishee "admits the debt."  If the garnishee disputes the debt, a motion under this provision must be denied, and the judgment creditor must look to the procedures authorized by N.J.S.A. 2A:17-61 and 2A:17-62.  See, e.g., Skevofilax v. Quigley, 810 F.2d 378, 383-85 (3d Cir. 1987) (in banc), cert. denied, 481 U.S. 1029 (1987); id. at 388 (Becker, J., concurring); id. at 390-91 (Stapleton, J., dissenting); Beninati v. Hinchcliffe, 126 N.J.L. 587, 20 A.2d 64 (Err & App. 1941).

Here, Colonial disputed its obligation to indemnify Echotree under the settlement agreement, and consequently the

---

[11].  This provision states:

> After a levy upon a debt due or accruing to the judgment debtor from a third person, herein called the garnishee, the court may upon notice to the garnishee and the judgment debtor, and if the garnishee admits the debt, direct the debt, to an amount not exceeding the sum sufficient to satisfy the execution, to be paid to the officer holding the execution or to the receiver appointed by the court, either in 1 payment or in installments as the court may deem just.

summary turnover procedure provided in N.J.S.A. 2A:17-63 was inapplicable. We therefore affirm the denial of Lesal's motion under that provision, but our decision is without prejudice to Lesal's pursuit on remand of the other New Jersey statutory procedures that may be employed by a judgment creditor to execute on its judgment debtor's unliquidated indemnification rights. See Skevofilax, 810 F.2d at 383-85.

IV.

For these reasons, we reverse the order of the district court entering judgment for Colonial and CorEast; we affirm the order denying Lesal's summary turnover motion; and we remand this case for further proceedings on Lesal's alter ego and third-party beneficiary claims.